[No. S004703. June 9, 2003.]

THE PEOPLE, Plaintiff and Respondent, v.
MICHAEL ANTHONY COX, Defendant and Appellant.

918

**COUNSEL**

Frank O. Bell, Jr., Fern M. Laethem and Lynne S. Coffin, State Public Defenders, under appointments by the Supreme Court; Barry P. Helft, Assistant State Public Defender, Joel Kirshenbaum, Michael Pescetta, Musawwir Spiegel and Mary McComb, Deputy State Public Defenders for Defendant and Appellant.

John K. Van de Kamp, Daniel E. Lungren and Bill Lockyer, Attorneys General, Steve White, George Williamson and Robert R. Anderson, Chief Assistant Attorneys General, Jo Graves, Assistant Attorney General, Ward A. Campbell, Edmund D. McMurray, Harry Joseph Colombo, John G. Mclean and R. Todd Marshall, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**MORENO, J.**—On November 26, 1985, defendant Michael Anthony Cox was sentenced to death for the 1984 first degree murders of three teenage girls—Denise Galston, her sister Debbie Galston, and Lynda Burrill—with the special circumstance of multiple murder. (Pen. Code, §§ 187, 190.2, subd. (a)(3).) This appeal is automatic. (Pen. Code, § 1239, subd. (b).) For the reasons stated below, the judgment is affirmed.[1]

### I.

### GUILT PHASE

#### A. *Overview*

Nona Chapman ran a foster home for teenage girls on Weswin Court in Placerville. Darlene S. (Darlene), age 17, moved into the home on December

---

[1] Claims relating to defendant's habeas corpus petition are addressed in the companion decision *In re Cox* (2003) 30 Cal.4th 974 [135 Cal.Rptr.2d 315, 70 P.3d 313], filed simultaneously with this opinion.

14, 1983. Debbie Galston (Debbie), age 14, moved in on May 11, 1984, left two weeks later, and returned on July 10, 1984. Her sister, Denise Galston (Denise), also age 14 (they were two of a set of triplets), moved in on May 23, 1984. Joanna N. (Joanna), age 17, moved in on May 25, 1984.

Joanna testified that she saw defendant stab Denise to death on June 12, 1984. Denise's body was found in the El Dorado National Forest on July 31, 1984. Her clothes were found on April 30, 1985, near the location where her body had been found.

Lynda Burrill (Lynda), age 18, lived with roommates in Placerville and was acquainted with the girls who lived in the foster home. She disappeared on June 29, 1984, and was last seen with defendant. Her body was found in the El Dorado National Forest on August 4, 1984. A week later, her clothes were recovered near the location where the body was found.

Debbie disappeared from the foster home on August 8, 1984. Joanna, who was Debbie's roommate at the home, found her clothes in the El Dorado National Forest on August 10, 1984. Debbie's body was found on October 27, 1984, not far from where her clothes were found.

Defendant, then age 27, worked at a convalescent hospital in Placerville. Although employed, he often slept in his car, which he would park in downtown Placerville. He met Darlene in January 1984 and immediately began dating her. They would often go camping in the areas where the victims' bodies were later recovered. They married in September 1984, but defendant left Darlene in November of that year. Defendant knew all of the murdered girls, as he frequented an arcade called The Oz in downtown Placerville where they congregated, and he often picked up Darlene at the foster home. Testimony showed he had a low regard for the three victims.

Darlene testified that defendant told her shortly after Debbie disappeared that he had killed all three girls. Defendant was arrested on November 10, 1984 for the three murders.

B. *Defendant's Attitude Toward the Victims*

Several teenage girls testified that prior to Denise's murder on June 12, 1984, defendant had made rude and threatening comments toward the three victims. For example, Michele D. (Michele), age 15, testified that she met defendant in April of 1984 and that defendant called Denise a slut, stated that Debbie was "turning out real bad," and called Lynda a "hoser." Michele further stated that defendant's whole attitude changed in the spring and

summer of 1984. "He became obscene and started listing people, labeling them, what they were and stuff." Defendant told Michele that she "shouldn't be like them."

Lynette H., age 16, testified that in early April of 1984 she was riding in defendant's car when he told her "that some of the girls downtown had a bad reputation to him," and that they were "sluts."

Lynne A., a high school student, testified that she knew Debbie, Denise, and Lynda from downtown Placerville. In May of 1984, she was with the three victims and two other girls near The Oz when defendant came by, called the girls "sluts," and made a vulgar sexual reference toward them. On another occasion, Lynne A. testified that Lynda and two other girls were seated on a bench and defendant yelled from his car, "Does your mama know where you sluts are at?"

Darlene testified that defendant called Denise a slut. She stated that in the spring of 1984, she and defendant were in his car and they saw Denise smoking a cigarette outside the foster home. Defendant told Darlene "three would be eliminated from the foster home and three more." On cross-examination, however, Darlene stated that "eliminate" was her word.

C. *Murder of Denise Galston*

Denise was last seen on June 12, 1984, the day she was murdered. Joanna witnessed her murder, but did not come forward with this information until late October of 1984.

On July 31, 1984, Denise's remains were found. Loggers John Keyser and Todd Story were working off Ferrari Mill Road. They testified that they reached that spot by driving down Iron Mountain Road, also known as Mormon Emigrant Trail, crossing two dams and making a right turn onto Ferrari Mill Road. On Ferrari Mill Road, they traveled approximately three-quarters of a mile to an intersection known as "Four Corners," turned right and traveled about one-half to three-quarters of a mile. There they found a human skull and other bones. They found no clothing. Through dental records, including X-rays, it was determined that the bones were the remains of Denise. The pathologist was unable to determine the cause of death; all she could state was that there was no observable trauma to any of the bones.

On the evening of June 12, Joanna went to a church parking lot and began drinking. Thereafter, she went to downtown Placerville. She witnessed a commotion, during which Ron Burelco threw a cement block through the

windshield of a patrol car. This incident took place between 9:10 and 9:30 p.m. At this time, she saw defendant by the Bell Tower (a local downtown landmark) in his car. He told Joanna that he wanted to talk to her. She got in his car and they drove to the city park. Defendant made a sexual overture to Joanna and grabbed her breast. Joanna returned downtown, where she saw Denise arguing with police officers. She pulled Denise aside and spoke with her. She then walked over to the Stancil's Toyota dealership, where she again saw Denise, and the two spoke briefly. Denise left, and Joanna watched her walk under an overpass, toward the foster home.[2]

Joanna then saw defendant drive by and she made a rude gesture using her third finger, in response to the earlier incident in his car. Defendant stopped where Denise was walking. Joanna stated that it looked like they were arguing and Denise got into his car. The car turned around, approached Joanna, and stopped. Denise asked Joanna to get in the car. Joanna agreed, and sat in the front seat next to Denise. The three left Placerville and headed onto Highway 50. Defendant said they were going to a party. They got off at the Sly Park exit and drove onto Sly Park Road, and then onto Mormon Emigrant Trail. Soon thereafter, the car then turned onto a dirt road, which was Ferrari Mill Road. Joanna saw yellow letters on a tree stump and asked to stop to go to the bathroom. The car eventually stopped and Joanna got out, walked about 100 yards away from the car and vomited. She climbed up a wooded area and washed her face in a "little trickle of water, a stream," which was "just barely enough to wash [her] face." She could see by moonlight. She then heard Denise screaming her (Joanna's) name, and went to the area where she heard Denise's voice. She saw Denise running in the nude with defendant chasing her. It looked like Denise's hands were tied behind her back. Defendant pushed Denise down, put a knife to her throat, and stabbed her. Joanna stated she ran away while Denise was still screaming.

Joanna reached the road from which they had turned off to get onto Ferrari Mill Road (Mormon Emigrant Trail), saw a car coming, and hid. A second car drove toward her, and when she realized that it was not defendant's, she ran out in front of the car. The driver turned out to be a person named Joe whom she previously had met at a place called Happy Trails. She got in his

---

[2]Placerville Police Officer Phillip Dannaker testified that on August 12, 1984, Joanna told him that on June 12, 1984, the night Denise disappeared, she watched as Denise walked through the Locust Street underpass, which was located approximately 200 yards from the foster home. Officer Dannaker added that Joanna told him that this was the last time she saw Denise. Outside of the jury's presence, Officer Dannaker stated that Joanna also told him that on June 12, she and Denise were drinking and that defendant dropped off Darlene at the foster home approximately the same time that she, Joanna, saw Denise walking through the underpass.

car, told him nothing, and he dropped her off at the Burger King in Placerville.

Once in town, Joanna said she met Bruce Nesthus and stayed over at his house. Nesthus confirmed that he saw Joanna by the Bell Tower at approximately 3:30 a.m. Nesthus stated that Joanna was very jumpy and her mind seemed elsewhere; she would look over her shoulder and, when a car came by, she would try to hide; and, when she walked into his house, she sighed with relief. Nesthus stated that they had sexual relations and Joanna left the next morning, telling him she was going water-skiing.

Adele Nelson, Joanna's social worker, met with Joanna on June 13, 1984. She had spoken with her on seven to 10 occasions prior to that date. She said Joanna's demeanor was substantially different on June 13. Nelson stated that it seemed that what they had discussed two days earlier "was completely out of her mind, and [Nelson] wondered what had happened to obliterate what had been important to her from her mind."

Joanna testified that she told no one of the murder, including the police, Nesthus, Chapman, her boyfriend Larry Wright, or Darlene because she thought she would get in trouble and be arrested for the murder. She added that she was ashamed that she had not helped Denise. Thereafter, she avoided defendant and the foster home, and often stayed with her boyfriend's grandparents. She left Placerville the last week of August 1984 and moved to Renton, Washington, to live with her brother.

Joanna "couldn't live with herself" and returned to Placerville by train on October 29, 1994 because "she had to come back and tell somebody." The evening of her return, Joanna talked to Placerville Police Officer Phillip Dannaker. She was visibly shaking and crying at times. She said she knew something about the murders but was afraid the police might think she was involved.

The next day, October 30, 1984, Joanna chanced upon Fay Harnage, the wife of El Dorado County Sheriff's Detective Erol Harnage. Fay Harnage testified that she and Joanna began talking after her dog barked at Joanna. It was the first time she had ever met Joanna. Joanna, she said, started talking about the murders and was on the verge of becoming hysterical. Fay Harnage informed her that she was a sheriff's wife and suggested that Joanna accompany her home and meet with her husband, Detective Harnage. Joanna agreed. Once at the residence, Joanna met Detective Harnage and agreed to speak with him and El Dorado County Sheriff Sergeant Bill Wilson about the murders.

Joanna told the two sheriff's deputies that she had information about the case they were investigating and wanted to talk to them, but was hesitant because she was afraid she had done something wrong and would be arrested. She explained that she had gone to Washington to try to get away from "it," but found she could not live with "it" and had returned to talk to them. She also said she was ashamed of herself. It was ultimately agreed that Joanna would talk with a psychologist, Dr. Frank Dougherty, who might be able to help her overcome her reluctance to tell the deputies what she knew about the case.

On November 1, 1984, Joanna had her first session with Dr. Dougherty. She met with him again on November 2. She told him that on June 12, she went to Sly Park with defendant and Denise, and that defendant murdered Denise, but she offered no other information. She later testified that, at this juncture, she had just wanted defendant to get arrested, she was not yet ready to tell the whole truth about what she had witnessed, and that she had lied to Dr. Dougherty about certain details.

On November 2, Dr. Dougherty and Sergeant Wilson conducted an interview with Joanna that was tape-recorded. That same evening, Sergeant Wilson suggested they "take Joanna in a vehicle to the location." Joanna agreed to direct Detective Harnage, Sergeant Wilson and Dr. Dougherty along the route she took the night of the murder. They left at 9:00 p.m. Joanna directed them to Highway 50, then to the Sly Park Road turnoff. From Sly Park Road, they drove to the intersection of Mormon Emigrant Trail, crossing two dams. Whenever she told them to make a turn, they would stop after the turn. Joanna would tell them that she did not wish to go any further; she wanted to go back home. They kept reassuring her that everything was all right. As they passed the second dam, Joanna told them to drive slowly. After crossing the dam, they turned right on Ferrari Mill Road, finally reaching the intersection known as Four Corners. They stopped. Joanna "was sunk way down low" in her seat and did not respond when Sergeant Wilson suggested she get out of the car. They turned around and headed back to the sheriff's office.

On November 5, 1984, Joanna and Dr. Dougherty had another session. The following day, November 6, Dr. Dougherty, Detective Harnage and Sergeant Wilson took Joanna in a vehicle and returned to Four Corners to see if Joanna could direct them any further. The closer they got to that location, the more fearful and reluctant Joanna became. Once on Ferrari Mill Road, as they approached Four Corners, Joanna said she remembered going further and started crying. At Four Corners, there was a stump with some yellow paint on it. Joanna told them to continue straight ahead, on Ferrari

Mill Road. After about a half-mile, she told them to turn around because they were on the wrong road. Back at Four Corners, Joanna said, "We went further down that road," pointing to the road where Denise's remains had been located. Joanna became very quiet and sat there crying. They returned to Placerville.

On November 7, Joanna had another session with Dr. Dougherty. After that session, Joanna gave a complete tape-recorded statement to the deputies describing the events of June 12. She said that when she saw the yellow paint on the stump she finally decided to tell the truth and leave out nothing.

On cross-examination, Joanna admitted having told a different story on November 7, compared to what she had said on the 10-minute tape prepared on November 2. The November 2 tape was played to the jury. She also admitted drinking a pint of rum and a six-pack of beer the night Denise was murdered. She stated that she applied for a reward in this case, but there was no evidence that Joanna was aware of the reward when she came forward. Joanna stated she thought the moon was full that night. In fact, it was one night before a full moon. Joanna stated that she previously recalled saying that there was a "stream" in the area where she had washed her face.

Whether water was actually present in the area where Joanna claimed she had washed her face was the subject of much testimony. Susan and Charles Greenwood, who lived at the end of the road where Denise's remains were located, stated there was no standing water anywhere near where Denise's body was found.

However, Ronald Jones, Director of the El Dorado County Irrigation District, testified that he maintained the rainfall records at Sly Park Dam. He stated that in 1984, it rained .19 inches on June 4, .74 inches on June 5, .24 inches on June 6, and .15 inches on June 7. Prior to June 4, the previous rainfall had occurred on May 3, 1984.

Brian Morris, a registered professional forester with the United States Forest Service who studied soil hydrology and watershed management, testified that he viewed Denise's remains on July 31, 1984, the day they were discovered. The body was on the uphill side of a log, 200 feet up the slope of the roadway, about 100 feet east of an ephemeral draw. He described such a draw as a swale with a rounded bottom that occasionally collected water. He also found culverts that would form shallow puddles during the time of a runoff. He stated that, given the rainfall in that first week of June 1984, he would reasonably expect that on June 12, 1984, water would pool and go down into the culvert.

John Cleever, a logger, testified that he went to Four Corners on June 9, 1984 (three days before the murder) to report for work. He said that he drove up Ferrari Mill Road to Four Corners and wanted to make a right turn (onto the road where Denise's remains were found), but there was a big mudhole with standing water, so he parked elsewhere.

The Greenwoods testified that the yellow-painted stump that was identified by Joanna first appeared in August 1984, after the murder was committed.

But Dennis Ringnes, a timber sale administrator with the United States Forest Service, testified that in a timber sale, trees to be cut are painted with a special "tracer" paint that is kept under lock and key in order to prevent individuals from painting additional trees not included in the timber sale. He stated that the yellow stump identified by Joanna was painted with that yellow tracer paint in 1979. John Cleever also testified that the trees in that area were painted yellow prior to June 1984.

Darlene testified that she was with defendant the night Denise was murdered, and they had driven to Sports Kingdom Hall and McDonald's in Placerville. She said defendant kept a knife above the car's sun visor and handcuffs in the backseat. She stated that defendant was "cleaning his gun and sharpening his knife" and told her he was "going to take care of business." On cross-examination she admitted that at the preliminary hearing, she said that petitioner had said, "Tonight is going to be a good night for business." She said that defendant took her back to the foster home at 10:00 p.m. She ate a banana and went to the "top of the hill" near the foster home to smoke a cigarette. From that vantage point, she saw defendant pick up Denise underneath the overpass, turn around and stop. She never saw Denise again. She did not see defendant the following day.[3]

On April 30, 1985, James Stalford was scouting for wood 100 yards off Ferrari Mill Road by the Four Corners intersection when he came across a "reversible [jacket] either dark blue or black on one side and orange on the other." He stated that underneath the coat was a purple sweatshirt, bra, tennis shoes, and denim pants. There was no blood on the clothes. Bruce Nesthus stated that the reversible jacket belonged to him, and that he had loaned this jacket to Denise while they were standing by the Sports Kingdom Hall on June 12, the night Denise was murdered. Nesthus testified that he saw Joanna at that time as well, standing by the fence at the Stancil's Toyota dealership.

---

[3]Outside the jury's presence, Darlene testified that she did not disclose to anyone that she saw Denise get into petitioner's car until Friday, June 7, 1985, three days before she began her jury trial testimony on Monday, June 10, 1985.

On June 22, 1985, during trial, Sergeant Wilson directed Joanna to take him to the spot where Denise had been killed. Joanna did not want to go, but Sergeant Wilson insisted. Once at Four Corners, he told her to direct him. Joanna said to drive straight ahead. After about 75 yards, Joanna said that this was not the road, and to turn around. Once back at Four Corners, at Joanna's direction, they next took the road to their right. After about 150 yards, she said that this was "not the road either," and they returned to the intersection. When he asked her which was the correct road, Joanna pointed to the road to the west. They drove down that road. Joanna told Sergeant Wilson that it was the correct road but that it looked different. Wilson said it was possible it looked different because it had been logged. At the first landing, or wide spot in the road, Joanna said she did not recall this location, but to keep going. They next went directly into some trees and Joanna stated, "Now I remember this being this way." At the second wide spot, Joanna said she remembered going this way, and said to keep driving. At the third wide spot in the road she asked Wilson to stop. He asked her why. "This is the spot," she said, and she became very quiet and began to cry. Wilson stated that this was "almost the same spot" where the jury's bus had stopped when the jurors viewed the area where Denise's remains had been located.

### D. *Disappearance of Lynda Burrill*

Lynda, Shane Daniels, Sher L. (Sher), Todd Baxter, and Bob Jacobs shared a home on Benham Street in Placerville. Lynda lived at this location until she disappeared on June 29, 1984. On August 4, 1984, William Hurley and his wife were camping just off Four Corners on Ferrari Mill Road. While walking through the woods with his dog, he and his wife found a human skull and other skeletal remains scattered over an area of about 25 square yards. Through dental records, including X-rays, it was determined that the bones were Lynda's. The pathologist was unable to determine the cause of death; she could state only that there was no observable trauma to any of the bones.

A week later, Hurley and his wife returned to the area where they found the skull. They were looking for clothes. About 150 yards from where they had found the skull, the Hurleys found clothing on the ground, including a bra, panties, a lavender knit top and a yellow shirt. The four pieces of clothing were in close proximity. Sher identified those items as the clothing Lynda was wearing the night she disappeared. Lynda's mother, Sharon Burrill, also identified the clothing as belonging to Lynda.

On June 29, Sher, Baxter, Jacobs, Daniels, and Lynda had dinner at their Benham Street house. Sher testified that after Daniels and Jacobs left, she

and Lynda walked downtown. They met a friend, Darin McArthur, at the furniture store, and the three sat on a bench in front of the bakery. Sher saw Lynda go into The Oz. Lynda left The Oz with defendant and they headed toward the downtown parking lot. Sher knew defendant from The Oz and from around town. She testified that defendant and Lynda were talking. Sher asked Lynda where she and defendant were going, and Lynda told her she was going to the downtown parking lot and would be "right back." McArthur also stated he saw Lynda pass by with defendant and that Lynda said she would be right back. Lynda never returned.

Cheryl Hall, who worked for the Placerville News Company, a downtown newsstand, testified that she saw Lynda and defendant walk past her newsstand on a Friday or Saturday in late June, talking to each other. Hall recounted that Sher was across the street on a bench and Lynda crossed to talk to her while defendant waited. Hall did not see what happened thereafter. Hall stated that the following day, Sher told her that Lynda had not come home and Sher "was really worried about her."

On Saturday, June 30, at 10:00 a.m., defendant went to Joe and Linda Crespin's house. He spoke to Linda Crespin. She remembered the date because it was her 17th wedding anniversary. She asked defendant if he was dating anyone. He replied, "Yes, I'm seeing a girl named Lynda." She was not sure if he used the word "seeing" or "dating." Crespin remarked on the coincidence that her own name was Linda. Defendant replied, "Yes, but she's not like you." He added, "girls like that should be eliminated." Crespin was sure defendant used the word "eliminated." Crespin stated that defendant had a scratch on his forehead and when she pointed it out, he said he got the scratch "cutting wood." She later observed him put some medicine on the scratch.

A few days after Lynda's disappearance, Sher was using a pay telephone in the downtown parking lot, talking to Lynda's father, Donald Burrill. Sher saw defendant park his car, exit the vehicle, and walk with Darlene out of the parking lot. As they passed her, Sher asked defendant where Lynda had gone "that night." Defendant replied, "Lynda who?" Sher then specified to defendant Lynda's last name (Burrill). When defendant said he "didn't know if he knew her," Sher described Lynda. Defendant then said he did not know Lynda and he was not in town that night. Sher told defendant she had seen him with Lynda that night. Defendant replied, "Well, whatever."

Upon learning that his daughter was last seen with defendant, Donald Burrill called defendant's place of employment, the El Dorado Convalescent Hospital, and spoke to defendant on July 5 by telephone. He asked defendant: "What did you do with my daughter?" Defendant replied, "Darlene and

I do not know your daughter." Burrill described Lynda to defendant as a young girl acting as a counselor, helping people downtown who were on drugs. Defendant replied, "Darlene and I are not on drugs. We don't take drugs." Defendant stated that he would talk to Darlene when he got off work and he would call Burrill back. About 15 to 20 minutes later, defendant telephoned Burrill and said: "Darlene and I do not know Lynda. Besides, I wasn't even in town that night." Burrill testified that he had specifically told defendant the night he was concerned about was the Friday before July 5, which was June 29.

On July 20, 1984, El Dorado County Sheriff's Detective William White interviewed defendant about Lynda. At the time, all Detective White knew was that Lynda was missing under suspicious circumstances, and that defendant had been seen with her on June 29. Detective White showed him a photograph of Lynda and asked him if he knew her. Defendant said "that he may have seen her, may have known her, but his girlfriend Darlene knew her better." When asked if he had been with Lynda on the night of June 29, defendant said that "he could have but he didn't recall, wasn't sure." When asked if he might have accompanied Lynda to the downtown parking lot, defendant replied that "he may have seen her at The Oz, or may have seen her at the Bell Tower, but he didn't recall walking with her to the parking lot." Defendant then said he might have walked her to the parking lot, but he was not sure.

Darlene testified that on one occasion at the downtown parking lot, Lynda was on the phone and defendant told Darlene that "he knew her parents." In addition, in early November 1984, defendant told Linda Crespin that "[he] and Darlene gave Lynda a ride from one corner to the next . . . close to where Lynda lives, and then [defendant] went in and told Lynda's mother that he did just that." But Lynda's mother, Sharon Burrill, testified that she did not know defendant, had never met defendant, and had never spoken to him in person or by telephone.

Lynette H. testified that she was friends with Lynda, and that she knew defendant. Lynette H. stated she would often see him at the downtown parking lot, The Oz, and the Bell Tower. In the spring of 1984, she observed Lynda and defendant together "five or six times." They would be walking together or talking, and they were usually alone. They frequented the area between the downtown parking lot and The Oz.

### E. *Disappearance of Debbie Galston*

Debbie disappeared on August 8, 1984. On October 27, 1984, Thomas Whisenhunt was deer hunting in the area of Baltic Ridge Road and North

South Road. About a quarter-mile from the intersection of North South Road and Baltic Ridge Road and about 150 feet off the road, Whisenhunt found the remains of a young girl. The body was about 10 feet from an oil spot and looked as if it had been dragged. No other items were found at the location. Through dental records, including X-rays, it was determined that the remains were those of Debbie. The pathologist was unable to determine the cause of death because the decomposition of the mummified remains destroyed all such evidence. The pathologist further stated that she was unable to find trauma to any of the bones.

Brenda Hartman worked with defendant at the El Dorado Convalescent Hospital. She believed that he was a judgmental person who would label young women as "loose." In the middle of July of 1984, defendant offered Hartman a ride home after her car had broken down. On the way, defendant drove to the foster home to pick up Darlene. Hartman stated that Debbie was sitting on an open windowsill and said, "Darlene, better watch out, Mike has a girl in the car, and he's going out on you again." Darlene came outside and called Debbie a "bitch." Hartman testified that defendant told Darlene, "Well, you don't have to worry about her much longer."

Joanna testified that several days before Debbie's disappearance, while inside the foster home, Darlene and Debbie were having an ongoing argument about defendant. When the argument moved outside, Joanna followed Darlene and Debbie because defendant was there. Joanna testified that defendant told Debbie, "I'm going to get you." Joanna further stated that after June 12, the date Denise disappeared, Debbie became afraid of defendant. Whenever he was around, she would leave. As Joanna explained, "Wherever he was at, we were not there."

Shawn Philpott also testified that Debbie was afraid of defendant. He stated that he had been acquainted with Debbie and had struck up a friendship with her in the weeks prior to her disappearance. On one occasion, while driving with Debbie in his truck, they saw defendant driving towards them from the opposite direction and Debbie "tucked down below the front dash" until defendant passed. On a second occasion, Debbie was with Philpott in front of The Oz when defendant approached in an automobile and Debbie, said Philpott, "pushed me in front of her and then she proceeded to walk behind the rest of the crowd of people." On a third occasion, by the Bell Tower, defendant approached in his car and Debbie, said Philpott, "tucked behind me."

On August 8, 1984, while at a birthday party for Larry Vorce at Benham Park that Debbie attended, Michael Nuss saw defendant's car drive by the

park. The driver "drove by real slow looking through the park." All Nuss could see was that the window was down, the driver was a male with short hair and the car was traveling "five miles an hour, or slower." No one else was in the car. Nuss thought the time was about 8:00 or 8:30 p.m. Nuss had seen defendant's car earlier in the day at the AM-PM Mini-Market, when they were getting ready for the party.

About 8:30 p.m., Debbie mentioned to Vorce that she had to leave the party as she had to be back at the foster home by 9:00 p.m. Debbie asked Keith B., Katrina M., and a third person, identified only as Logan, to walk "her some of the way." The three walked with her for a short distance and returned.

Darlene testified that on August 8, she and defendant spent the early evening drinking with defendant's mother and his mother's boyfriend at the mother's trailer on Big Cut Road. Upon leaving, they drove to Benham Park where Darlene used the restroom. They stayed at the park for about 15 minutes. Darlene saw Debbie at the park drinking with other people. Defendant then took Darlene home. Darlene testified that during that evening, defendant pulled a knife from his car's sun visor, put it in his pants and told Darlene "he had to take care of business."

Barbara Rugg, who worked at Nona Chapman's foster home, testified that Darlene was the first foster child to arrive home that evening. Rugg believed that Darlene returned between 7:45 and 8:00 p.m. Rugg testified that she recalled thinking this was unusual, because Darlene usually did not return home until 11:00 p.m. or midnight.

That same day, August 8, Joanna and her boyfriend, Larry Wright, were together. They returned to the foster home about 8:30 p.m. They wanted to talk to Debbie, but she was not there. They waited until 9:00 p.m., Debbie's curfew, and then went out looking for her. They did not find her. Debbie did not return home.

On August 10, 1984, Joanna and Wright went on a picnic, intending to drive to Anderson Ridge in Wright's grandparents' truck. They took Wright's dog with them. Wright stated the purpose of the picnic was to calm Joanna down and get her away from town because Debbie was still missing and Joanna was upset. They eventually reached North South Road and the "bridge to nowhere." Wright insisted that Joanna did not give him any directions as to where to drive. At the bridge, Joanna noticed a tennis shoe lying by the creek and pointed it out to Wright. They also saw some clothing in a bush on a small island in the creek. They found pants, a shirt,

undergarments, another shoe and a sock. Joanna recognized the clothes as belonging to Debbie and became hysterical; she began to cry "and just became unglued."

They gathered the clothes and put them in the back of the truck. On the way to the sheriff's office, they met Deputy Sheriff Paul Odlin at the Sly Park Dam. They led Odlin back to the "bridge to nowhere," and showed him where they had found the clothing. Odlin noted that Joanna was shaky and nervous, with tears in her eyes. She kept talking about "how it was Debbie's clothes and [she] was hoping [Odlin] would find her."

### F. Defendant's Statements to Darlene

Darlene testified under a grant of immunity. She stated that a day or two after Debbie disappeared, she was at the Exxon station in Placerville with defendant, cleaning defendant's car, when she discovered a unicorn key chain. She recognized the key chain as Debbie's. She stated that defendant asked her to "put it back into Debbie's belongings." However, on two other occasions during her testimony, she said the key chain belonged to Denise. Then she corrected herself and said the key chain was Debbie's and that she put the key chain into Debbie's drawer at the foster home.

Darlene claimed that at the Exxon station, defendant told her "[h]e had strangled [Denise], stabbed her [and] had sexual intercourse with her." She said defendant told her "[h]e had strangled [Lynda], stabbed her and had sexual intercourse with her." She said defendant told her "[h]e strangled [Debbie], stabbed her and had sexual intercourse with her." She responded, "I don't know" when asked whether defendant had sexual relations before or after he killed the girls. She said defendant was able to do this to the girls because he "handcuffed their hands and tied their feet." She was not asked, nor did she offer any further details about the murders other than to say that defendant's statements "kind of upset [her] [a]n awful lot."

On cross-examination, she stated that prior to testifying, she had spoken to Ron Tepper, the trial prosecutor, and Sergeant Wilson each about 50 times. She asserted that the only time defendant talked to her about the murders was that one time at the Exxon station. She said defendant told her he stabbed Denise "in the stomach." Shortly thereafter, however, she changed her testimony and stated defendant stabbed Denise "in the chest." She reiterated that defendant told her he tied Denise's feet, but when confronted with the fact that Denise ran away, she immediately said, "No, he didn't have time to tie up her feet." She insisted that defendant told her both Denise and Lynda were killed near North South Road. Both girls' bodies, however, were found near Ferrari Mill Road.

Defendant married Darlene on September 15, 1984, but he ended the relationship less than two months later, on November 7 or 8, 1984. Darlene admitted that she and defendant were no longer together as of November 7, 1984, and that defendant left her for another woman. On November 9, 1984, Joanna and Darlene were together at the sheriff's station. Sergeant Wilson and Joanna told Darlene that Joanna witnessed Denise's murder. Sergeant Wilson provided Darlene with the details of Denise's murder. Defendant was arrested for the murders on November 10, 1984. Darlene admitted she first told police about the Exxon conversation after her conversation with Joanna and about two weeks after defendant was arrested.

### G. Darlene's Behavior After August 8, 1984

Immediately after Debbie's disappearance and the conversation at the Exxon station, Darlene began to act strangely. She also began to accuse defendant of committing the murders. For example, Barbara Rugg, who was in charge of the foster home during Nona Chapman's vacation, testified that on August 11, 1984, Darlene "started talking about guts and whatnot" and was acting "strange." Darlene, stated Rugg, had a knife and was "singing a chant." Rugg called the police at 4:00 a.m. on Sunday, August 12.

Placerville Police Officer Dannaker arrived. Darlene told him she thought Denise and Debbie were dead. She added, "I have visions about them being murdered. I see Denise being strangled and Debbie having her head bashed in." Officer Dannaker asked Darlene if defendant had anything to do with the disappearance of Denise or Debbie. She replied, "I don't know, he might have." When he asked her why, Darlene said, "I have these feelings. That's all I know." Darlene "was afraid that if [defendant] found out she had been talking to the Placerville Police about him that she might be hurt by him."

On August 12, Darlene directed Officer Dannaker and other police officers to North South Road by Camps Crossing. They were "going to search for graves." Darlene told Rugg before she went out to look for the bodies, "It's all going to be over with, Mike's going to be arrested." Darlene directed them to the Camp Creek Bridge. Once there, however, Darlene stated she had no idea where any bodies were buried. At that point, Officer Dannaker drove her back to the foster home.

Shirley W., Darlene's mother, testified that when Debbie was missing, she received several calls from her daughter, who was "very upset, crying." She told her mother, "Momma, I did not kill Debbie, Mike killed Debbie." She would not tell her mother how she knew the information.

Nona Chapman testified that when she returned to the foster home from her vacation on August 13, Darlene was an "entirely different person." For

example, Darlene was chopping a piece of binder paper with scissors. After Chapman told her to put down the scissors, Darlene took out her knife and jabbed another piece of paper. When Chapman asked her to put the knife down, Darlene said, "What's the matter, are you afraid I'll stab you?" On August 14, because Darlene was acting so strangely, she was taken from the foster home and spent 48 hours in a psychiatric facility.

## H. *Defendant's August 12, 1984, Encounter with Police*

On August 12, 1984, Officer Dannaker located defendant asleep in his car. He observed a gun handle protruding from under the driver's seat and recovered from the vehicle a fully loaded .357-caliber Smith and Wesson revolver, a small, fully loaded Ruger 10/22 rifle, and a .380-caliber Armi Tanfoglio semiautomatic pistol and matching ammunition. Handcuffs were also located in the rear floorboard area. A knife and scabbard were found in the trunk.

That same day, Placerville Police Sergeant William Scholtz took a tape-recorded statement from defendant. The tape was transcribed and most parts were read verbatim to the jury. Sergeant Scholtz told defendant he wanted to talk about the disappearance of Darlene's roommate. Defendant stated: "I knew her. She used to live with Darlene. Her name was Debbie. I don't know her last name." Defendant was asked when he last saw Debbie. He replied: "Well, when I went to pick up Darlene the other day—I don't remember what day it was. If you ask Darlene, she will tell you." When asked if this was the day she disappeared, defendant stated: "I didn't even know she was missing until a couple of days ago when she said—when Darlene said that the girl didn't come home. I don't have anything to do with the girls there period."

Later in the interview, defendant again was asked about his activities on Wednesday, August 8. He stated, "Yeah, Darlene told me the girl was missing that day. We went to my mother's." He claimed not to have seen Debbie at Benham Park. Other than visiting his mother, defendant had no specific recollection of Wednesday night, August 8, four days earlier. When asked if he stayed at the park for a while, defendant stated: "We usually stay [at my mother's] until dark or just before dark." "Then we go down just by Stancil's Toyota for maybe an hour unless I'm tired and take her home." After finding out that defendant usually slept in his car in one of two places, the officer asked: "Do you recall what you did on Wednesday night?" Defendant replied, "I just told you." The officer said, "No, I mean after you dropped off Darlene." Defendant said, "Yes, I went to the church parking lot and went to sleep. I don't remember that night specifically—before I was sleeping more at the gym."

Defendant also admitted that he was familiar with Sly Park and North South Roads. He stated that he went camping there with Darlene "as often as we can." When asked if he knew the Sly Park area very well, defendant stated, "Well, I know the lake and I know the campground I've camped at." The officer asked, "What about other than Sly Park?" Defendant replied, "North South Road . . . . There's a place called Camp Creek which I don't know is how many miles out but it was full so we came back and parked at the bridge where Darlene said that they found the girl's clothes."

## I. *Other Evidence*

In early September 1984, Patricia Kelly worked at the front desk and was a salesperson for Diamond Springs Racquet Fitness Center. Defendant was a member and would be there "just about every single morning" when the club opened. Kelly suspected her husband of seeing another woman who was only 18 years old and discussed her suspicions with defendant. She stated she was upset because she was much older than the girl and the situation "really bothered her." Defendant replied, "Whores like that should be eliminated."

Shirley W. testified that in late September 1984, Darlene and defendant were visiting, and Darlene wanted to show her newspaper clippings about Debbie and Denise. Shirley W. stated that she told Darlene that she did not want to read the articles. Defendant then volunteered that they "were whores and tramps and they should have been killed."

Joe Crespin met defendant through cutting his hair at his barbershop. He stated they were good friends. He would see defendant with some regularity and they would talk. Crespin testified that on a Sunday in late August 1984, he and defendant were driving south on North South Road by the Camp Creek Bridge, and defendant, pointing to the left-hand side of the bridge, told Crespin that was where Debbie's clothes were found. (That was the side of the bridge underneath which Debbie's clothes were located.) Because it "kind of shocked [him] a little bit," Crespin asked defendant how he knew this information, and defendant replied that Darlene told him.

In early November 1984, defendant spoke with Joe and Linda Crespin and the subject of how the girls were killed came up. Defendant said, "If I had stabbed the three girls would I be sitting here talking to you now?" It never occurred to Linda Crespin to ask defendant how he knew the three girls had met their deaths by stabbing. Joe Crespin also remembered the stabbing reference.

On November 21, 1984, Sergeant Wilson obtained a search warrant to search defendant's car, which had been impounded on the day of his arrest,

November 10. Inside the car, Sergeant Wilson found a hunting knife and sheath "up in the passenger side sun visor," and a buck knife and sheath on the backseat. He found a pair of handcuffs underneath the driver's seat and some nylon rope and rock pitons in the trunk area. There was no blood on either the knife or the sheath. However, a blood expert testified that if a knife had been wiped clean before being placed in the sheath, it would not be expected that blood would be found inside the sheath.

It was stipulated that no human blood was found on Debbie's or Lynda's clothing. No fingerprints of any of the victims were found in defendant's car or on items recovered as part of the investigation. No blood evidence linking defendant to the victims was introduced during the trial. The jury visited the various locations about which witnesses testified.

The black jacket found on April 30, 1985, with Denise's clothes was originally thought to be defendant's. Testimony was elicited to that effect from defendant's mother, Joe Crespin, and Sergeant Wilson. However, during trial, Bruce Nesthus positively identified the jacket as his, saying he lent it to Denise the night she was murdered. This disclosure prompted Sergeant Wilson to insist that Joanna take him to the location of Denise's murder on June 22, 1985, while the jury trial was in progress.

### J. Joanna's and Defendant's Knowledge of Undisclosed Facts

Sergeant Wilson testified that in a homicide investigation, he did not release to the public all the information in his possession "just in case someone came forward to give information, [he] would use that piece of [withheld] information and check their story." To his knowledge, there was no specific newspaper article that stated that the spot where Denise's body was found was reached by driving down Ferrari Mill Road to Four Corners and turning right.

The prosecutor brought in representatives from the relevant newspapers (the Mountain Democrat, the Sacramento Bee, the El Dorado Gazette and Foothill Times), radio stations (KAHI/KHYL), and television stations (channels 3, 10, 13, 31 and 40) to prove that the media had never disclosed (1) the precise location where Debbie's clothes were found; (2) the location where Denise's remains were found; or (3) that Denise was stabbed to death.

For example, an article in the Sacramento Bee, dated August 21, 1984, stated, "Galton's [sic: Galston's] 14-year-old sister, Debbie, is missing and some other clothing has been found in a forest at Camp Creek where the two girls' bodies were found." An article dated August 30, 1984 stated, "[Debbie's] clothes were found August 10th, at North South Road at Camp Creek about 10 miles west of where the two dead girls were found."

An October 30, 1984 article in the Sacramento Union stated: "The remains of the three teenagers have been found since July 31st in a forest near Camp Creek off North South Road east of Placerville. Skeletal remains found in the El Dorado National Forest were identified Monday as those of 14-year-old Debbie Galston." The article continued: "Two days later, her roommate and her boyfriend found Debbie's folded clothing, underwear, shoes and socks by a Camp Creek bridge while on a picnic, sheriff's deputies said."

One radio broadcast, airing August 4, 1984, stated only that Denise Galston's body was found "approximately one-half mile west of Ferrari Mill Road."

And an article in the Mountain Democrat, dated August 22, 1984, quoted Lieutenant Howard Wilson as saying: " 'Whether the victims were strangled, poisoned, stabbed . . . may never be known unless someone decides to talk about it.' "

## II. PENALTY PHASE

### A. *The Prosecution Case*

The People put on no new evidence, relying solely on the circumstances of the three murders of which defendant was found guilty.

### B. *The Defense Case*

Lloyd Kelley supervised defendant's forestry work for five months in 1978. Defendant took charge of the crew and acted as the leader in Kelley's absence. Defendant was a "very, very dependable" worker, and Kelley would hire him again. Defendant never used abusive language toward the female members of the crew.

Godfried German supervised defendant on a youth forestry conservation crew for three terms of 90 days each around 1975. Defendant was lead man for the crew part of the time. He was trustworthy and dependable. German stated he would hire defendant again.

Defendant worked for Marjorie Comer as a student aide in the library at El Dorado High School in 1974 or 1975. Defendant's picture was hung on the library's bulletin board as a "special kid" because of his good work. Comer stated that she gave defendant an A-plus for his work, which is unusual for her.

Jean Stokes, defendant's mother, stated that she did not live with or marry his father. When defendant was about one year old, she married Forest

Jayne. From the time defendant was 14 months old until he left home at age 16, defendant would often be disciplined and beaten by Jayne. Defendant was the oldest of six children. When he was about six years old, he swallowed gasoline and became ill. He shook all over. He was put in the hospital for a week. Phenobarbital was administered to calm him. He was not taken off this medication until he was about 10 years old.

Stokes suspected Jayne was molesting defendant. On one occasion, Jayne and defendant, then age 14, were alone together in Carmel (at Jayne's home/office). Stokes said she drove to Carmel, and tried to enter the location but the door was locked. When Jayne and defendant finally opened the door, she felt "something very bad was going on." When defendant was 12, the family had to move because Jayne got three neighborhood boys drunk and molested one of them.

Defendant, she said, took care of his younger siblings. He got them up for school, helped fix their dinners and tried to keep his family together. Once, during a snowstorm, Jayne drove the family car off a cliff and the car rolled over four or five times. Defendant rescued the baby and his mother, fearing the car would roll over again. He ran two miles in the snow to get help for his mother, who had broken her ribs. When she got home from the hospital, defendant helped and took care of the children.

Defendant had been married and had three children. He helped deliver his son. Stokes testified that this period occurred four or five years prior to the trial. Defendant, at the time, was very happy. Then, while he was back east in the Army, defendant learned from his grandfather that his wife had moved another man into their home. Defendant was upset. He was able to get out of the Army to address this situation. Defendant changed after he came home and his family was broken up. He was "hurting very badly." He would take long walks. He drank. He was quiet. He seemed unable to "get it together," and wanted to be alone. This is when he began to judge and classify people.

On cross-examination, Stokes said that after divorcing Jayne, she remarried and had a sixth child at age 40, when defendant was over 18. Defendant did not like his new sister and thought she was a "brat." When she was about two and a half to three years old, the child fell into some water. Defendant, who had been drinking, made no effort to save her, and another person pulled her out of the water.

Carolyn Jayne, defendant's half sister, testified on his behalf. She corroborated prior testimony that her father beat defendant and sexually abused him, and that defendant was instrumental in raising the other children. She

corroborated prior testimony that they had to move one time because their father had molested some young boys in the area.

Albert Globus, a psychiatrist, testified on defendant's behalf. He first examined defendant on December 12, 1984. He had read all the police and sheriff's reports about the case. He reviewed a neurological evaluation by Dr. A.T. Vogt, a clinical psychologist; the medical records of defendant's physician, Dr. Talcott Bates; the records of two electroencephalograms conducted on defendant in May 1963 and June 1962; the progress notes Dr. Bates made when treating defendant for a seizure disorder; a telephone conversation with defendant's attorney about defendant's biological father; psychological tests of defendant performed on July 19, 1985, by Dr. Edwards, a psychologist; an electroencephalographic report on defendant dated July 19, 1985; and a psychological evaluation by Dr. William G. Danton. Dr. Globus diagnosed defendant as having alcohol abuse in remission and organic brain syndrome, which he described as "some damage or deficit in function of nerve cells of the brain," which he characterized, in defendant's case, as mild.

It was stipulated that defendant had suffered no prior felony convictions.

C. *Rebuttal*

Joseph Chandler said that defendant was his foreman during the nine months he worked for the forestry service in 1979 or 1980. Defendant generally supervised nine people, including three women. Chandler stated that defendant "enjoyed the power he had as foreman and really tended to push it around quite heavily. He would make work extremely hard for some of the people he didn't like and made it great for those that he did, preferably the women." In the absence of the women, he talked about specific body parts and told the men "what he would like to do [to the women], and when he would offer to do that to them and they would turn him down, and he joked around about it to us." Most of the crew found defendant's behavior highly offensive.

Wayne Rice, like Chandler, worked under defendant for about nine months in 1977 or 1978. With women, defendant "would mention sexual things he would like to do to [the women members of the crew] and what he would like to have them do to him." Rice, who was 16 years old at the time, was so angered by defendant's words that he hit defendant with a tire iron in the presence of the other crew members. Rice admitted that he had suffered a prior felony conviction.

### III. Discussion—Guilt Phase

#### A. *Prior Representation of Prosecution Witnesses by Defense Counsel*

Defendant contends that he was deprived of effective assistance of counsel due to conflicts of interest arising from his attorneys' prior representation of four prosecution witnesses. We disagree.

##### 1. *Factual Background*

Prior to the preliminary hearing, Defense Counsel Patrick Forester, an assistant public defender, informed the court that a year earlier his office had represented Darlene's mother, Shirley W., who was then a prospective witness in a separate case in which the state sought to have Darlene declared a ward of the court on the basis of alleged sexual molestation by Gerald W., her stepfather. John Sudman, a deputy public defender in the same office as Forester, appeared as Shirley W.'s counsel at the detention, jurisdictional, dispositional, and review hearings. The petition was found true on January 27, 1984, and Darlene was made a ward of the court. On October 2, 1984, the public defender's office ceased its representation of Shirley W.

In light of this information, the trial court appointed John Olson as counsel for Shirley W. in order to advise her of her attorney-client privileges arising from that earlier representation. After consulting with Olson, Shirley W. agreed in open court to waive any privileges she may have had, and agreed that she could be cross-examined as to any discussions she had with Sudman.

On March 1, 1985, Forester declared a conflict of interest in a case involving James Carter, a potential prosecution witness. Forester never represented Carter. Attorney Stephen Tapson was appointed to represent Carter. On March 6, Tapson was replaced by another attorney, in anticipation of his appointment in the Cox case as second attorney. On March 7, Tapson was appointed as second attorney in the Cox case. Tapson represented that "at no time" had he talked to Carter. Forester informed the court that he explained the situation to defendant. Defendant then indicated to the court that despite this "possible conflict of interest," he still wanted Tapson appointed. Defendant specifically agreed to waive any possible conflict of interest.

Another potential witness, Darin McArthur, had previously been represented by Tapson's firm. Tapson informed all parties that he had had no contact with McArthur. Defendant again agreed to waive any possible

conflict of interest arising from that case. Forester indicated for the record that he fully discussed this situation with defendant, including the nature of the cases in which witnesses Carter and McArthur were involved, and defendant still wanted Tapson appointed. Defendant confirmed this statement to the court.

During trial, Lisa D. was called as a prosecution witness. Tapson indicated that the witness had previously been represented in juvenile court by another member of his firm. Tapson also indicated that his firm did not currently represent Lisa D. Tapson told the court that he was unsure if these facts constituted a conflict of interest. Forester indicated the defense would seek to impeach Lisa D. with her juvenile grand theft "conviction." The prosecutor thereafter agreed to raise this issue on direct examination. The court ruled there was no conflict of interest. Defendant never objected to his continued representation by counsel in light of any of these alleged conflicts of interest.

### 2. Legal Principles

■ The right to effective assistance of counsel, secured by the Sixth Amendment to the federal Constitution, and article I, section 15 of the California Constitution, includes the right to representation that is free from conflicts of interest. (*People v. Bonin* (1989) 47 Cal.3d 808, 833 [254 Cal.Rptr. 298, 765 P.2d 460] (*Bonin*).) To establish a federal constitutional violation, a defendant who fails to object at trial "must establish that an actual conflict of interest adversely affected his lawyer's performance." (*Cuyler v. Sullivan* (1980) 446 U.S. 335, 350 [100 S.Ct. 1708, 1719, 64 L.Ed.2d 333].) The *Sullivan* court made clear "that the possibility of conflict is insufficient to impugn a criminal conviction." (*Ibid.*)

"To show a violation of the corresponding right under our state Constitution, a defendant need only demonstrate a *potential* conflict, so long as the record supports an 'informed speculation' that the asserted conflict adversely affected counsel's performance. [Citations]." (*People v. Frye* (1998) 18 Cal.4th 894, 998 [77 Cal.Rptr.2d 25, 959 P.2d 183].) "But '[p]ermissible speculation giving rise to a conflict of interest may be deemed an informed speculation . . . only when such is grounded on a factual basis that can be found in the record.'" (*People v. Belmontes* (1988) 45 Cal.3d 744, 776 [248 Cal.Rptr. 126, 755 P.2d 310] (*Belmontes*), quoting *People v. Cook* (1975) 13 Cal.3d 663, 670-671 [119 Cal.Rptr. 500, 532 P.2d 148].)

■ To determine whether counsel's performance was "adversely affected," we have suggested that *Sullivan* requires an inquiry into whether counsel "pulled his punches," i.e., whether counsel failed to represent defendant as vigorously as he might have, had there been no conflict. (*People v.*

*Easley* (1988) 46 Cal.3d 712, 725 [250 Cal.Rptr. 855, 759 P.2d 490].) In undertaking such an inquiry, we are, as stated, bound by the record. But where a conflict of interest causes an attorney *not* to do something, the record may not reflect such an omission. We must therefore examine the record to determine (i) whether arguments or actions omitted would likely have been made by counsel who did not have a conflict of interest, and (ii) whether there may have been a tactical reason (other than the asserted conflict of interest) that might have caused any such omission. (*Id.* at p. 727.) In any event, a defendant may properly waive his right to the assistance of an attorney unhindered by a conflict of interest. (*Holloway v. Arkansas* (1978) 435 U.S. 475, 483, fn. 5 [98 S.Ct. 1173, 1178, 55 L.Ed.2d 426]; *Bonin, supra,* 47 Cal.3d at p. 837.)

### 3. *Discussion*

This is not a case in which defense counsel has undertaken multiple representation of defendants with competing interests. (See, e.g., *Holloway v. Arkansas, supra,* 435 U.S. 475.) Nor is it a case in which a former client was called as a witness, and was alleged to have "masterminded" the crime in which the current client was presently on trial. (*Leversen v. Superior Court* (1983) 34 Cal.3d 530 [194 Cal.Rptr. 448, 668 P.2d 755].) ▮ Instead, this is a case where three of four witnesses were previously represented by other attorneys in counsel's firm in matters that were unrelated to the current trial, and where counsel was appointed to represent the fourth witness, but never spoke to the witness before being replaced. (See, e.g., *Belmontes, supra,* 45 Cal.3d at p. 776.)

▮ A conflict *may* arise if a former client is a witness in a new case because the attorney is forbidden to use against a former client any confidential information acquired during that attorney-client relationship. (*Bonin, supra,* 47 Cal.3d at p. 835; *Leversen v. Superior Court, supra,* 34 Cal.3d at p. 538.)

But if the attorney possesses no such confidential information, courts have routinely held that no actual or potential conflict of interest exists. For example, in *People v. Lawley* (2002) 27 Cal.4th 102, 145-146 [115 Cal.Rptr.2d 614, 38 P.3d 461], we upheld the trial court's ruling that no conflict existed, given that advisory counsel possessed no confidential information stemming from his prior representation of a prosecution witness in several factually unrelated cases. Similarly, in *People v. Clark* (1993) 5 Cal.4th 950, 1001-1002 [22 Cal.Rptr.2d 689, 857 P.2d 1099] (*Clark*), we held that no actual or potential conflict existed where the public defender possessed no confidential information stemming from his prior representation of three prosecution witnesses.

In *Belmontes, supra,* 45 Cal.3d at pages 774-777, we held that the record did not establish that counsel had an actual or potential conflict of interest stemming from his firm's prior representation of the codefendant, because the attorney possessed no confidential information stemming from that earlier representation. (See also *Vangsness v. Superior Court* (1984) 159 Cal.App.3d 1087, 1089-1092 [206 Cal.Rptr. 45] [same].)

■ In the present matter, defendant has made no showing that an actual or potential conflict existed that adversely affected counsel's performance. Instead, defendant makes only the conclusory assertion that defense counsel could not effectively cross-examine witnesses Lisa D., McArthur, and Carter as to the "circumstances of the charges upon which counsel formerly represented them." Defendant makes no claim that defense counsel could not effectively cross-examine these witnesses as to their testimony in the current case, nor does he assert that defense counsel even possessed confidential information acquired during the former representation. Defendant's assertion falls far short of an informed speculation grounded in a factual basis that can be found in the record. (*Belmontes, supra,* 45 Cal.3d at p. 776.)

For example, Lisa D. testified that while she was with Lynda and two other girls, defendant asked them: "Hey sluts, does your mama know where you are?" She also stated she saw defendant and Lynda together in the downtown parking lot. Forester, not Tapson, vigorously cross-examined Lisa D. This last fact is relevant because any alleged conflict as to Lisa D. arose from her relationship with Tapson, not Forester. We have held that it is appropriate for a cocounsel who has no conflict with a witness to conduct cross-examination. (See, e.g., *Clark, supra,* 5 Cal.4th at p. 1002 [no conflict where cocounsel, who had not represented witness, conducted cross-examination].) We hold that no actual or potential conflict existed as to witness Lisa. D.

James Carter testified that he saw Denise the night she disappeared and that the last person he saw her with was *not* defendant. Darin McArthur testified that he saw defendant and Lynda together the night she disappeared. Nothing in the record suggests, nor has defendant alleged, that Forester possessed confidential information stemming from the public defender's prior representation of Carter. Tapson stated he had never met Carter and represented to the court that he possessed no confidential information. Tapson also stated that he had no confidential information regarding McArthur stemming from his firm's prior representation of him. Based on this record, we hold that no actual or potential conflict of interest existed as to witnesses Carter and McArthur.

Finally, as to Shirley W., after consultation with an independent lawyer, she waived, in open court, any attorney-client privilege she possessed and

agreed she could be cross-examined as to any discussions she had with the public defender's office. As defendant's counsel were not forbidden from using any confidential communications against Shirley W., there was no actual or potential conflict of interest.

### B. *The Prosecutor's Reference to a Polygraph Examination*

#### 1. *Factual Background*

During the testimony of Joanna, the sole eyewitness to the murder of Denise, the prosecutor asked on direct examination, "Did someone come along from the District Attorney's Office and talk to you, a man that gave you a polygraph?" Joanna replied, "Yes, sir." The prosecutor then asked, "Did you tell him what had happened . . . ." The prosecutor was interrupted and Forester asked for a bench conference. He vigorously objected. The jury was excused and the matter was heard.

The prosecutor informed the court that Joanna had been untruthful during this polygraph examination. The judge nonetheless chastised the prosecutor: "[T]he evil of the question when you ask if she met with someone who gave her a polygraph examination, because of your position, it would seem to me a logical inference for the jury to conclude is that the District Attorney had a polygraph given to this lady, he's an honorable man, and she didn't pass it, so he wouldn't be here seeking her testimony in the court. I see it as error on your part to have asked the question." The defense declined the prosecutor's offer to stipulate that Joanna was untruthful. The court restated that the question itself was "clear error" and gave the defense the weekend to decide if it wanted to request a mistrial. In the interim, the court ruled that Joanna's testimony would continue, and the answer would be struck. The court gave the jury the following admonition: "Ladies and gentlemen of the jury, a question was put to you shortly before the recess that was to the effect as to whether or not the witness recalled talking to a polygraph operator. That question is struck. You are cautioned to disregard it. You are to treat it as though you never heard it."

Thereafter, the prosecutor asked Joanna if she recalled talking to a Gene or Raymond Hawkins from the district attorney's office. When she replied yes, the prosecutor elicited that she was untruthful to him and, later, to other members of law enforcement. Joanna testified that she told the truth only after her last counseling session with Dr. Dougherty on November 7, 1984. Defendant's subsequent motion for a mistrial was denied.

#### 2. *Applicable Law*

Evidence Code section 351.1, subdivision (a) prohibits "any reference to an offer to take, the failure to take, or the taking of a polygraph examination," unless all parties stipulate to the admission of such results. Defendant

claims (1) that the prosecutor committed gross misconduct by asking the polygraph question and the court should have granted the mistrial because the court's admonition did not cure the prejudicial impact of the question; and (2) the mere asking of the question denied him the right to effectively cross-examine Joanna.

Defendant's first claim is fairly broken down into two parts: (a) that the prosecutor committed misconduct by informing the jury that Joanna took a polygraph test and such misconduct prejudiced defendant; and (b) that the trial court should have granted the motion for a mistrial because of the prejudicial impact of the prosecutor's question.

### a. *Alleged Prosecutorial Misconduct*

■ "It is, of course, misconduct for a prosecutor to 'intentionally elicit inadmissible testimony.' [Citations.]" (*People v. Bonin* (1988) 46 Cal.3d 659, 689 [250 Cal.Rptr. 687, 758 P.2d 1217].) To preserve such a claim, the defendant must generally object and request the court to admonish the jury to disregard the misconduct. "The reason for this rule, of course, is that 'the trial court should be given an opportunity to correct this abuse and thus, if possible, prevent by suitable instructions the harmful effect upon the minds of the jury.' [Citations.]" (*People v. Green* (1980) 27 Cal.3d 1, 27 [164 Cal.Rptr. 1, 609 P.2d 468] (*Green*).) " 'What is crucial to a claim of prosecutorial misconduct is not the good faith *vel non* of the prosecutor, but the potential injury to the defendant.' [Citation.]" (*People v. Williams* (1997) 16 Cal.4th 153, 252-253 [66 Cal.Rptr.2d 123, 940 P.2d 710] (*Williams*).)

■ Defendant's prosecutorial misconduct contentions must fail. Here, it cannot be said that the prosecutor's asking of a single question in violation of Evidence Code section 351.1 constituted a pattern of conduct so egregious that it rendered the trial fundamentally unfair in denial of defendant's federal constitutional right to due process of law. (*People v. Samayoa* (1997) 15 Cal.4th 795, 841 [64 Cal.Rptr.2d 400, 938 P.2d 2].) Moreover, even assuming the prosecutor's action amounted to misconduct under state law, no prejudice appears. In response to defendant's objection, and before Joanna could respond, the trial court immediately struck the prosecutor's question and forcefully told the jurors to disregard it. (See *People v. Rich* (1988) 45 Cal.3d 1036, 1093 [248 Cal.Rptr. 510, 755 P.2d 960] [concluding that a timely objection to a question pertaining to polygraph examinations of witnesses other than the defendant would have cured any error].) Additionally, the conduct at issue was an isolated instance in an otherwise well-conducted month-long trial in which 90 witnesses testified. (See *People v. Smithey* (1999) 20 Cal.4th 936, 961 [86 Cal.Rptr.2d 243, 978 P.2d 1171] [no

prejudice resulting from isolated instance of a prosecutor's attempt to elicit inadmissible opinion from an expert witness].) No basis for reversal appears.

### b. *Mistrial*

██ We review the denial of a motion for mistrial under the deferential abuse of discretion standard. (*People v. Cunningham* (2001) 25 Cal.4th 926, 984 [108 Cal.Rptr.2d 291, 25 P.3d 519]; *People v. Price* (1991) 1 Cal.4th 324, 428 [3 Cal.Rptr.2d 106, 821 P.2d 610] (*Price*).) "A motion for mistrial is directed to the sound discretion of the trial court. We have explained that '[a] mistrial should be granted if the court is apprised of prejudice that it judges incurable by admonition or instruction. [Citation.] Whether a particular incident is incurably prejudicial is by its nature a speculative matter, and the trial court is vested with considerable discretion in ruling on mistrial motions.'" (*People v. Jenkins* (2000) 22 Cal.4th 900, 985-986 [95 Cal.Rptr.2d 377, 997 P.2d 1044], quoting *People v. Haskett* (1982) 30 Cal.3d 841, 854 [180 Cal.Rptr. 640, 640 P.2d 776] (*Haskett*).)

██ In the context of erroneously offered polygraph evidence, we have held that a trial court's timely admonition, which the jury is presumed to have followed, cures prejudice resulting from the admission of such evidence. For example, in *Price*, a prosecution witness admitted, on cross-examination, having taken lie detector tests. Defense counsel moved for a mistrial because the information gave the witness "a false aura of credibility." We disagreed: "The mention of polygraphs in [the witness's] testimony was brief and nonresponsive. He did not state what questions he was asked or what the examiner concluded about his truthfulness. The admonition the court gave was thorough and forceful; it was sufficient to prevent any prejudice to defendant." (*Price, supra*, 1 Cal.4th at p. 428.) We reached the same conclusion, under very similar facts, in *People v. Morris* (1991) 53 Cal.3d 152, 193-194 [279 Cal.Rptr. 720, 807 P.2d 949]. (See also *People v. Carpenter* (1979) 99 Cal.App.3d 527, 532-533 [160 Cal.Rptr. 386] [prosecutor's single remark, in his opening statement, that a "polygraph operator" was called in was cured by defense counsel's prompt objection and the trial court's strong admonition to the jury].) We therefore conclude that the trial court acted well within its discretion in denying defendant's mistrial motion.

No case cited by defendant compels a contrary result. For example, in *People v. Basuta* (2001) 94 Cal.App.4th 370 [114 Cal.Rptr.2d 285] (*Basuta*), the prosecutor, in trying to rehabilitate the lone witness and bolster her credibility, violated a preexisting court order not to mention that the witness had taken a polygraph test. The court held that this error, *in combination* with another, more serious error by the trial court (excluding evidence that the

baby's mother was physically violent to the baby, which might have been the proximate cause of the baby's death) was prejudicial. (*Id.* at pp. 390-391.)

In *People v. Schiers* (1971) 19 Cal.App.3d 102, 108-114 [96 Cal.Rptr. 330] (*Schiers*), the court reversed the judgment of conviction where there was extensive testimony that the defendant had failed a polygraph exam. The admonition to the jury to disregard this testimony was not given promptly, but hours later. In *People v. Andrews* (1970) 14 Cal.App.3d 40 [92 Cal.Rptr. 49] (*Andrews*), the key prosecution witness (and former codefendant), when asked by the court whether he had taken a lie detector test and whether charges against him were dismissed thereafter, replied in the affirmative. (*Id.* at pp. 44-45.) The Court of Appeal reversed the resulting judgment of conviction, as the court's question was tantamount to receiving the results of a lie detector test into evidence. (*Id.* at p. 45.)

These three cases are inapposite to the facts here. There was no combined error here (see *Basuta, supra,* 94 Cal.App.4th 370), there was no receipt into evidence of defendant's failure to take a polygraph examination (see *Schiers, supra,* 19 Cal.App.3d 102), nor was there the court's admission of the results of a lie detector test taken by a former codefendant (see *Andrews, supra,* 14 Cal.App.3d 40). As noted, there was one improper question that was immediately struck, and the jury was given a strong admonition. The trial court properly denied defendant's motion for a mistrial.

c. *Right to Effective Cross-examination*

Defendant conclusorily alleges that he was denied the right to cross-examine Joanna as a result of the prosecutor's reference to the polygraph examination. However, defendant does not explain how, where, or when this alleged deprivation took place. While this claim may stem from defense counsel Forester's statement, outside the jury's presence at the mistrial hearing, that the polygraph reference prevented him from asking questions about Joanna's being a witness to Denise's killing and finding Debbie's clothes on August 10, 1984, Forester assured the court "that at the time [I] come to that particular [point] in cross-examination, [I will] put in the record that I am not asking these questions for that reason." However, Forester made no such representation during cross-examination. As the issue was not preserved for appeal, it is deemed to have been forfeited. (*People v. Poggi* (1988) 45 Cal.3d 306, 331 [246 Cal.Rptr. 886, 753 P.2d 1082].)

Regardless, a careful review of the record reveals that counsel was not precluded from pursuing these areas in his cross-examination of Joanna. Nor was counsel prevented from asking Larry Wright about his and Joanna's discovery of Debbie's clothes. In short, this claim is without merit.

## C. Gun Evidence

■ Defendant claims that the introduction into evidence of the three guns found during the search of his car on August 12, 1984, was prejudicial error as they "were never shown to have any connection with the commission of the offenses." While we agree that admission of the guns might have been improper if offered as "other crimes" evidence, under the facts of this case, the guns were sufficiently connected to the crimes; thus, their admission into evidence was proper.

Darlene testified that she and defendant often went camping, and that while camping, defendant would shoot his gun. Darlene stated defendant had handcuffs and guns in his car, and kept a knife over the sun visor. When the prosecutor asked "how many guns," the defense objected on relevance grounds, and argued that because Darlene's testimony would be that defendant stabbed the girls, there was no evidence showing that guns were used. The court sustained the objection on Evidence Code section 352 grounds.[4]

At the prosecutor's request, the court later revisited this ruling. The prosecutor offered two theories of admissibility. First, given that the cause of death of the three victims could not be determined, it was reasonably possible that a firearm was the cause of death. Second, given that there was evidence that Debbie was afraid of defendant, the guns might have been used to coerce her into his car. Defense counsel argued that the guns were being introduced to show that defendant was a bad person. The court reversed its earlier ruling, reasoning that because the cause of death was not known, the prosecution "should be allowed to show that defendant had instruments that would allow him to overpower and cause the death of these young girls."

■ An appellate court applies the abuse of discretion standard to review any ruling by a trial court on the admissibility of the evidence, including a ruling on an Evidence Code section 352 objection. (*People v. Waidla* (2000) 22 Cal.4th 690, 724 [94 Cal.Rptr.2d 396, 996 P.2d 46].) The trial court's ruling was correct.

In *People v. Riser* (1956) 47 Cal.2d 566 [305 P.2d 1], the defendant murdered two people during a robbery. The killing was committed with a Smith and Wesson .38-caliber Special revolver. The gun was never recovered. (*Id.* at p. 573.) Riser was found with three holsters, one of which could

---

[4]Evidence Code section 352 provides that "[t]he court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing issues, or of misleading the jury."

hold a .38-caliber Smith and Wesson Special revolver. Riser also possessed a Colt .38-caliber revolver, which could not have been the murder weapon. (*Id.* at p. 577.) We stated the rule of admissibility as follows: "When the specific type of weapon used to commit a homicide is not known, it may be permissible to admit into evidence weapons found in the defendant's possession some time after the crime that could have been the weapons employed. There need be no conclusive demonstration that the weapon in defendant's possession was the murder weapon. [Citations.] When the prosecution relies, however, on a specific type of weapon, it is error to admit evidence that other weapons were found in his possession, for such evidence tends to show, not that he committed the crime, but only that he is the sort of person who carries deadly weapons. [Citations.]" (*Ibid.*) Because the murder weapon was known, we ruled that the admission of the Colt .38-caliber revolver was error, but such error was not prejudicial. (*Ibid.*)

 Here, it is not known how the three victims were killed. Although the prosecutor argued that the evidence pointed to a stabbing, such argument did not preclude the reasonable possibility that one or all three of the victims had been shot. (See, e.g., *People v. Manson* (1976) 61 Cal.App.3d 102, 207 [132 Cal.Rptr. 265] ["The trier of fact is not limited to any hierarchy of theories selected by the prosecution"].)

Moreover, given Lynda's statement to Sher when she walked off with defendant, that "she would be right back," and given the evidence of Debbie's fear of defendant and that she presumably was alone when she entered defendant's car, it is also reasonable to infer that defendant, who had unfettered access to three weapons, may have used the same to get Lynda and Debbie into his car and keep them in his car during the drive to the location of their murder.

In *People v. Carpenter* (1999) 21 Cal.4th 1016, 1052 [90 Cal.Rptr.2d 607, 988 P.2d 531], we held it was proper for a witness to testify that the defendant told her he kept a gun in his van. "Although the witness did not establish the gun was necessarily the murder weapon, it might have been. . . . The evidence was thus relevant and admissible as circumstantial evidence that he committed the charged offenses." (*Ibid.*)

We have also held that when weapons are otherwise relevant to the crime's commission, but are not the actual murder weapon, they may still be admissible. (*People v. Neely* (1993) 6 Cal.4th 877, 896 [26 Cal.Rptr.2d 189, 864 P.2d 460]; *People v. Lane* (1961) 56 Cal.2d 773, 784 [16 Cal.Rptr. 801, 366 P.2d 57].) Thus, in *Neely* we admitted evidence of a rifle located in the defendant's truck parked near the crime scene even though the rifle was not

the murder weapon, as it was "not irrelevant" to the charged offenses. (*Neely, supra*, 6 Cal.4th at p. 896.) In *Lane*, we upheld the admission of guns found in an "abandoned truck miles from the scene of the homicide," not as relevant to the homicide per se, but as weapons "of a character which could be used in armed robbery . . . in furtherance of the criminal plan." (*Lane, supra*, 56 Cal.2d at p. 785.)

Here, the guns were relevant either as possible murder weapons, or as weapons that could have been used to coerce the victims into defendant's car or otherwise subdue them, "in furtherance of the criminal plan" to kill them. There was no error in admitting the guns in evidence.

### D. *Evidence of Fear of Defendant*

#### 1. *Debbie*

Joanna testified on direct examination that several days before Debbie's disappearance, Darlene and Debbie had an argument about defendant and defendant said to Debbie, "I'm going to get you." Joanna also testified that in the month after Denise died, Debbie appeared to be afraid of defendant. Defendant did not object to this testimony. Shawn Philpott testified regarding three instances in which Debbie hid from defendant. In the defense case, however, testimony was elicited that Joanna and Larry Wright told Sergeant Scholtz that Debbie "would get into a car with a stranger."

■ Defendant contends that it was prejudicial error to admit Philpott's testimony that Debbie hid from defendant because the evidence was not material to any disputed issue in the case and was thus irrelevant. The prosecutor's theory of admissibility was that, because Debbie's fear of defendant would prevent her from voluntarily getting into his car, it was a permissible inference that he used a weapon, such as a gun, to get Debbie into his car. The evidence was properly admitted.

Circumstantial evidence showing that the victim feared the defendant may be admissible if the acts or conduct of the victim prior to the crime are at issue. (*People v. Lew* (1968) 68 Cal.2d 774, 779 [69 Cal.Rptr. 102, 441 P.2d 942]; *People v. Armendariz* (1984) 37 Cal.3d 573, 586 [209 Cal.Rptr. 664, 693 P.2d 243] [evidence that the victim feared the defendant is admissible "when the victim's conduct in conformity with that fear is in dispute"]; cf. *People v. Ruiz* (1988) 44 Cal.3d 589, 608 [244 Cal.Rptr. 200, 749 P.2d 854] [victims' expressions of fear of the defendant were inadmissible where "neither the states of mind of these victims prior to their deaths . . . nor their acts or conduct . . . were an issue in the case which might have been resolved or assisted by the challenged evidence"].)

In the present case, the prosecutor's theory was that defendant drove Debbie to the murder scene in his vehicle. The circumstances surrounding Debbie's entry into defendant's car—whether she would enter the car voluntarily or whether defendant may have overcome any resistance by force—were at issue. In *People v. Sakarias* (2000) 22 Cal.4th 596, 628-629 [94 Cal.Rptr.2d 17, 995 P.2d 152], we stated that evidence that the murder victim feared the defendant was admissible to show that she would not have voluntarily given him any of her personal property and thus it could be inferred the property was obtained by force. Here, evidence that Debbie had acted as though she feared defendant was admissible to show that she would not have voluntarily entered defendant's car and thus he may have forced her into his vehicle the night she disappeared.

Even assuming Philpott's testimony was admitted in error, such error would be harmless. Joanna had previously testified, without objection, that Debbie was afraid of defendant. As we stated in *Green, supra,* 27 Cal.3d at page 27, where evidence of fear is admitted in error but "is cumulative of other properly admitted evidence to the same effect," such error is not prejudicial. It is not reasonably probable that a result more favorable to defendant would have occurred in the absence of Philpott's testimony. (*People v. Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].)

## 2. *Darlene*

On cross-examination, defendant elicited the fact that two significant events preceded Darlene's November 1984 revelation that defendant had confessed to her at the Exxon station: (1) Darlene spoke to Joanna at the sheriff's station about Joanna's witnessing Denise's murder; and (2) defendant left Darlene in November 1984, less than two months after they were married. In this manner, defendant attempted to show that Darlene fabricated the confession.

The prosecutor then stated that, pursuant to the "state of mind" exception (Evid. Code, § 1250, subd. (a)),[5] he wanted to present evidence that on August 12, 1984, Darlene told Officer Dannaker she was afraid that defendant would hurt her if he knew she talked to the police, as well as testimony

---

[5]Evidence Code section 1250, subdivision (a) provides, in pertinent part, that "evidence of a statement of the declarant's then existing state of mind, emotion, or physical sensation (including a statement of intent, plan, motive, design, mental feeling, pain, or bodily health) is not made inadmissible by the hearsay rule when: [¶] (1) The evidence is offered to prove the declarant's state of mind, emotion or physical sensation at that time or any other time when it is itself an issue in the action; or [¶] (2) The evidence is offered to prove or explain acts of the declarant. [¶] (b) This section does not make admissible evidence of a statement of memory or belief to prove the fact remembered or believed."

from Barbara Rugg that on August 12, 1984, Darlene told her "a couple of times" that "she was afraid [defendant] would find out about her talking to the police." The prosecutor's theory was that such evidence of fear would explain why Darlene waited so long to come forward, and would rebut the defense claim of recent fabrication.

▊ Evidence Code section 1250, subdivision (a)(1) provides that if the declarant's state of mind "is itself an issue," evidence of a statement of declarant's then existing state of mind or emotion is admissible. Typical statements considered of a state of mind include belief and knowledge. (1 Jefferson, Cal. Evidence Benchbook (Cont.Ed.Bar 3d ed. 2003) § 14.7, p. 212.) Here, defendant's claim that Darlene fabricated defendant's confession at the Exxon station squarely put Darlene's state of mind in issue. Because her fear of defendant on August 12 tended logically to provide a legitimate reason for her withholding this confession, the statements were admissible.

Defendant claims that the court abused its discretion under Evidence Code section 352 in admitting the prejudicial evidence that Darlene feared defendant. Evidence Code section 352 rulings are reviewed under the abuse of discretion standard. (*People v. Alvarez* (1996) 14 Cal.4th 155, 214-215 [58 Cal.Rptr.2d 385, 926 P.2d 365].) The court did not abuse its discretion, as the evidence of fear was properly admitted under Evidence Code section 1250 and its probative value was not substantially outweighed by the probability of undue prejudice.

### E. *Prosecutorial Misconduct*

▊ Sergeant Wilson told the jury that Joanna was placed in protective custody after she directed police to the location where Denise was killed. The court requested a sidebar conference. At sidebar, the court stated that, although there was no objection, he thought the reference to protective custody was prejudicial because the jury could infer that Joanna was placed in protective custody for fear that she would be harmed. The prosecutor told the court she was placed in protective custody "to keep her from abusing herself" and offered to cure any potential misconception. The court suggested that the prosecutor talk to the witness, and a brief recess was taken. When testimony resumed, the prosecutor asked Sergeant Wilson if he was "fearful if you weren't able to put [Joanna] where you had a string, so to speak, of bringing her back and forth that she might abuse herself?" After Sergeant Wilson replied yes, the prosecutor asked, "And that's the predominant reason why you effected that arrangement?" Defendant objected and another sidebar conference was held. The court agreed with defendant's objection to the word "predominant," and the answer was struck. When

testimony resumed, the prosecutor asked Sergeant Wilson, "[W]as that the reason she was placed in that kind of situation?" Sergeant Wilson replied, "[T]hat was one of the reasons." Defendant again objected. At sidebar, the court explained that it was concerned about "the unstated implication that [Joanna] was placed in protective custody because of the fear that [d]efendant might do some harm to her." When testimony resumed, Sergeant Wilson stated that the "other reason" Joanna was in protective custody was that she was "possibly a witness to a homicide." Contrary to defendant's assertions, nothing in the record suggests that the prosecutor intentionally elicited the term "protective custody" to show that Joanna could be harmed by defendant. Instead, this "unstated implication" was a product of the court's speculation. Simply stated, defendant was arrested three days after Joanna was put in "protective custody." There was no evidence admitted showing that, during this three-day period, defendant knew Joanna had returned to Placerville one week earlier, or that she had spoken to police. The jury heard only that Joanna was an alcoholic and that the police were afraid that, as a potential witness, she might run away. "When [a prosecutorial misconduct] claim focuses on comments made by the prosecutor before the jury, a court must determine at the threshold how the remarks would, or could, have been understood by a reasonable juror. [Citations.] If the remarks would have been taken by a juror to state or imply nothing harmful, they obviously cannot be deemed objectionable." (*People v. Benson* (1990) 52 Cal.3d 754, 793 [276 Cal.Rptr. 827, 802 P.2d 330].) There was no prosecutorial misconduct based on these facts.

## F. *Motion for Mistrial*

 Joanna claimed that earlier in the evening of Denise's murder, she saw defendant in his car and he told her he wanted to speak to her. Joanna entered his vehicle. They drove to the city park and stayed in the automobile. The prosecutor asked Joanna if she could relate the substance of their conversation without repeating the specific words. Defendant objected and requested a sidebar conference. Defense counsel wanted to ensure that the specific words of defendant and Joanna's conversation, which were sexual in nature, would not be put before the jury. The prosecutor agreed that there was no need to elicit "vulgarisms." When testimony resumed, the prosecutor asked Joanna, "without using the exact words," if she could "kind of put into a category" what defendant said to her. Joanna replied that defendant "suggested having anal sex with me." Defendant objected. The prosecutor explained, at sidebar, that Joanna related to him that defendant actually told her "he wanted to fuck her in the ass" and he instead expected to elicit from Joanna that defendant "made a sexual overture." The court struck the question and answer and admonished the jurors to disregard it as though they had never heard it.

Defendant claims that Joanna's explicit reference to "anal sex" was so prejudicial that the trial court erred in denying defendant's motion for a mistrial. We disagree.

As noted, the court immediately struck the question and answer and admonished the jury to disregard it as though they never heard it. Recognizing that the evidence was excluded as more prejudicial than probative (Evid. Code, § 352), "the prejudice to defendant was not incurable by admonition or instruction." (*Price, supra,* 1 Cal.4th at p. 431.) It must be presumed that the jurors acted in accordance with the instruction and disregarded the question and answer. (See, e.g., *People v. Rocha* (1971) 3 Cal.3d 893, 901 [92 Cal.Rptr. 172, 479 P.2d 372]; *People v. Seiterle* (1963) 59 Cal.2d 703, 710 [31 Cal.Rptr. 67, 381 P.2d 947].)

In *People v. Duncan* (1960) 53 Cal.2d 803 [3 Cal.Rptr. 351, 350 P.2d 103], a murder case in which the prosecutor sought to portray the defendant as a sexually promiscuous woman, the trial court struck all such questions and answers and told the jury to disregard them. The defendant requested a mistrial because the questions tended to degrade and debase her. (*Id.* at p. 818.) We declared: "Even if we accept defendant's contentions that the evidence objected to was inadmissible, it is clear that it did not go to the main issue in the case, and we must assume the jury obeyed the court's instructions to disregard it." (*Ibid.*) As in *Duncan,* the trial court here properly ruled that a mistrial was not warranted under these circumstances.

### G. *Evidence That Joanna Directed Sheriffs to the Murder Scene*

Defendant contends it was error to admit Sergeant Wilson's testimony that on November 2, 1984, he, Detective Harnage, and Dr. Dougherty asked Joanna to direct them to the murder location. She eventually directed them to the Four Corners intersection on Ferrari Mill Road. Joanna was insistent that the windows be rolled up; she did not want to go further and was crying. Defendant also contends it was error to admit Sergeant Wilson's testimony that on November 6, 1984, the four returned to the Four Corners intersection. Joanna remembered an incline and she indicated that they (Joanna, defendant, and Denise) "went down that road," which was the road near which Denise's body was located. She also recognized a tree stump with yellow writing.

The court admonished the jury that Joanna's statements were not admitted for the truth of the matter asserted, "but simply to allow [the jury] the indicia of what her state of mind was at that time and what the demeanor was during the course of the trip[s]." And after a sidebar conference, the court further

admonished the jury that Joanna's statements concerning directions to a particular location were not being offered as direct evidence but to show her knowledge at the time the trips were made.

The defense also objected to Sergeant Wilson's testimony that he told Joanna on June 22, 1985, to take him to the "exact" place where Denise was killed, which was well after the trial started and after extensive press coverage of the case.

Defendant claims that this evidence was inadmissible hearsay that did not come within the state of mind exception set forth in Evidence Code section 1250, subdivision (a), and instead is prohibited under subdivision (b) of that statute. We disagree. Evidence Code section 1250, subdivision (a) provides that evidence of a statement of a declarant's then existing state of mind is admissible when such state of mind is itself an issue in the action, or when the evidence is offered to prove or explain acts by the declarant.[6]

Joanna's statements made during the three trips fall within the Evidence Code section 1250 exception because typical statements considered of a state of mind include belief and knowledge. (1 Jefferson, Cal. Evidence Bench-book, *supra*, § 14.7, p. 212.) And, as we rejected defendant's Evidence Code section 1250 claim as to Darlene's statements, *ante*, we similarly reject defendant's Evidence Code section 1250 claim that Joanna's statements were inadmissible, because these statements tended to show that Joanna knew where Denise was murdered.

 One court explained the Evidence Code section 1250 state of mind exception in the following manner: "The evidence admitted under section 1250 is hearsay; it describes a mental or physical condition . . . and is received for the truth of the matter stated. [Citation.] If offered to prove the declarant's state of mind, the statement may be introduced without limita-tion, subject only to [Evidence Code] section 352. However, the declarant's state of mind must be at issue in the case." (*People v. Ortiz* (1995) 38 Cal.App.4th 377, 389 [44 Cal.Rptr.2d 914] (*Ortiz*).)

The *Ortiz* court continued: "In contrast, a statement which does not directly declare a mental state, but is merely circumstantial evidence of that state of mind, is not hearsay. It is not received for the truth of the matter stated, but rather whether the statement is true or not, the fact such statement was made is relevant to a determination of the declarant's state of mind. [Citation.] Again, such evidence must be relevant to be admissible—the declarant's state of mind must be in issue. ([Evid. Code,] § 210.) A limiting

---

[6] For the relevant text of Evidence Code section 1250, see footnote 5, *ante.*

instruction is required with declarations used as circumstantial evidence of the declarant's mental state; that is, the declaration is not received for the truth of the matter stated and can only be used for the limited purpose for which it is offered. ([Evid. Code,] § 355.)" (*Ortiz, supra,* 38 Cal.App.4th at pp. 389-390.)

As a threshold matter, Joanna's state of mind was clearly at issue in this trial. The defense heavily attacked her credibility by pointing out, for example, how long it took for her to come forward as a witness, that she passed up several opportunities to inform law enforcement officials about the crime, and that she admitted telling a different story on November 7, 1984, as compared to a tape-recorded interview that took place on November 2. Indeed, the defense's theory was that Joanna was not present when Denise was murdered. Applying the principles outlined in *Ortiz,* Joanna's demeanor and her ability to give directions to the scene of the crime, the exact location of which was unreported, constituted nonhearsay circumstantial evidence of her state of mind, in this case, knowledge. This testimony was admitted with the proper limiting admonishment. It must be presumed that the jury followed the court's admonition. (*People v. Mickey* (1991) 54 Cal.3d 612, 689 [286 Cal.Rptr. 801, 818 P.2d 84].)

### H. *Absence of Defendant and Counsel from Readback of Testimony*

Defendant claims that he was denied due process of law because he was absent from the readback of testimony, which was a critical stage of the proceedings. This contention is without merit. We have repeatedly stated that the rereading of testimony is not a critical stage of the proceedings. (See, e.g., *People v. Ayala* (2000) 23 Cal.4th 225, 288 [96 Cal.Rptr.2d 682, 1 P.3d 3] (*Ayala*); *People v. Horton* (1995) 11 Cal.4th 1068, 1220 [47 Cal.Rptr.2d 516, 906 P.2d 478].) Moreover, defendant and his attorneys specifically waived their presence at the readback of testimony. *Fisher v. Roe* (9th Cir. 2001) 263 F.3d 906, cited by defendant, is not on point. In contrast to the situation here, the defendant and his lawyer there were excluded from the readback of testimony without their consent. (*Id.* at p. 916.)

### I. *Cumulative Error*

Defendant argues that the cumulative effect of all the errors he alleges rendered his proceeding fundamentally unfair. We disagree. Defendant has demonstrated few, if any, errors, and we have found each possible error to be harmless when considered in isolation. Considering them together, we likewise conclude their cumulative effect does not warrant reversal of the judgment.

IV. Discussion—Penalty Phase

A. *Failing to Instruct on "Other Crimes" Evidence*

Defendant argues that the trial court committed prejudicial error because it failed to discharge its sua sponte duty to instruct the jury, at the penalty phase, that the jury could not consider "other crimes" evidence as aggravating circumstances unless it first found those crimes were proven beyond a reasonable doubt. (See, e.g., *People v. Robertson* (1982) 33 Cal.3d 21, 53-55 [188 Cal.Rptr. 77, 655 P.2d 279].) Specifically, defendant argues that the prosecutor, in his case-in-chief at the guilt phase, introduced "other crimes" evidence of defendant's gun possession and the fact defendant may have also raped the three victims. Thus, the court's failure to give this instruction requires reversal. This contention is without merit.

The prosecutor did not take the position or argue that evidence of defendant's supposed gun possession or sexual intercourse with the victims constituted evidence in aggravation; rather, such evidence was admitted at the guilt phase only and *was not mentioned* during the penalty phase. Indeed, both the prosecutor and defendant argued at the penalty phase as if the only aggravating circumstance at issue was the fact that defendant murdered the three teenage girls seriatim.

In *People v. Maury* (2003) 30 Cal.4th 342, 443 [133 Cal.Rptr.2d 561, 68 P.3d 1], we stated that "in the absence of a request, the trial court is under no duty to give an instruction at the penalty phase regarding evidence received at the guilt phase. [Citations.] Even when section 190.3, factor (b), criminal activity is expressly alleged, which was not the case here, 'the rule absolving the court of a sua sponte duty to instruct on the elements of crimes introduced under [section 190.3,] factor (b) " 'is based in part on a recognition that, as [a] tactical matter, the defendant "may not want the penalty phase instructions . . . [to] lead the jury to place undue emphasis on the crimes rather than on the central question of whether he should live or die." [Citations.]' " ' [Citation.] If a trial court need not instruct a jury sua sponte as to the elements of alleged other crimes, given the possible undue emphasis which the defense may fear the jury will place on them [citation], a trial court is obviously under no sua sponte obligation to instruct the jury on the prosecution's burden of proving other crimes that are not clearly introduced under section 190.3, factor (b). [Citations.]" Based on the foregoing authority, the court was not required to instruct the jury on other crimes evidence.

B. *Brown Error*

Defendant claims that the court's penalty phase instructions, in conjunction with his attorney's closing argument, misled the jury as to its sentencing

responsibility. ██ In *People v. Brown* (1985) 40 Cal.3d 512, 540-544 [230 Cal.Rptr. 834, 726 P.2d 516] (*Brown*), reversed on another issue *sub nomine California v. Brown* (1987) 479 U.S. 538 [107 S.Ct. 837, 93 L.Ed.2d 934], we recognized that the "unadorned" phrase in former CALJIC No. 8.84.2 that the trier of fact " '*shall* impose a sentence of death' " (italics added) if it " 'concludes the aggravating circumstances outweigh the mitigating circumstances' " could mislead the jury: "a juror might understand his function as (i) merely the 'counting' of factors and then (ii) reaching an 'automatic' decision, with no exercise of personal responsibility for deciding, by his own standards, which penalty was appropriate. [Citation.]" (*People v. Milner* (1988) 45 Cal.3d 227, 256 [246 Cal.Rptr. 713, 753 P.2d 669].)

In cases tried before *Brown*, such as the case before us, we look to the entire record "to determine whether, in context, the sentencer may have been misled to defendant's prejudice about the scope of its sentencing discretion . . . ." (*Brown, supra,* 40 Cal.3d at p. 544, fn. 17.) We are satisfied, on this record, that the jury understood its duty to carefully and properly weigh its decision. The prosecutor correctly pointed out to the jury that "you are commanded by the law to take these eleven factors and weigh and consider them, not in a mechanistic sense, but in a sense that gives true value and weight to each of the factors, as you, the jury, determine them to be."

Although defense counsel stated, in one instance, that "if the aggravating factors outweigh the mitigating then you must sentence [defendant to death]," his next statement was, "And if you find to the contrary, then you will sentence him to life without the possibility of parole." He then argued that "when you weigh [the mitigating factors] those factors will prevail."

The jury was also instructed that it was "obliged to weigh mitigating evidence against aggravating evidence in exercising its sentencing discretion. Although the law seeks to ensure that this discretion is not weighed arbitrarily, i.e., without regard to the evidence, the weighing process is not mechanical." As we stated in *People v. Weaver* (2001) 26 Cal.4th 876, 985 [111 Cal.Rptr.2d 2, 29 P.3d 103]: " '[N]owhere did the prosecutor [or defense attorney] urge the jury to merely count the number of aggravating and mitigating factors and mechanically or arithmetically impose the death penalty.' [Citation.]" Because both the prosecutor and defense counsel here urged the jury to *weigh* the aggravating and mitigating factors, we find no *Brown* error under these facts.

C. *Emotional Disturbance as a Mitigating Factor*

██ Defendant claims that Penal Code section 190.3, factor (d), by asking the penalty jury to consider whether defendant acted under "extreme

mental or emotional disturbance" during the commission of the offense, unduly limited the kinds of evidence admissible at the penalty phase. This contention is without merit. We have repeatedly rejected challenges to the word "extreme" in section 190.3, factor (d). (See, e.g., *People v. Burgener* (2003) 29 Cal.4th 833, 885 [129 Cal.Rptr.2d 747, 62 P.3d 1] (*Burgener*); *People v. Roybal* (1998) 19 Cal.4th 481, 522-523 [79 Cal.Rptr.2d 487, 966 P.2d 521]; *People v. Jones* (1997) 15 Cal.4th 119, 190 [61 Cal.Rptr.2d 386, 931 P.2d 960]; *People v. Ray* (1996) 13 Cal.4th 313, 359 [52 Cal.Rptr.2d 296, 914 P.2d 846]; *People v. Ghent* (1987) 43 Cal.3d 739, 776 [239 Cal.Rptr. 82, 739 P.2d 1250].) Because Penal Code section 190.3, factor (k) of the 1978 death penalty law permitted the jury to look to "any other circumstance which extenuates the gravity of the crime," it therefore allows consideration of any mental or emotional condition, even if it is not "extreme." (*People v. Clark* (1992) 3 Cal.4th 41, 163 [10 Cal.Rptr.2d 554, 833 P.2d 561].)

### D. *Prosecutorial Misconduct During the Penalty Phase Argument*

██ Defendant contends that the prosecutor's penalty phase closing argument constituted misconduct because it improperly appealed to the jury's passions. Because there was no objection or request for admonishment, defendant is deemed to have forfeited the objection and the point cannot be raised on appeal. (*People v. Medina* (1995) 11 Cal.4th 694, 775-776 [47 Cal.Rptr.2d 165, 906 P.2d 2] (*Medina*).)

In any event, this argument is without merit. The prosecutor made allusions to the fact that the three girls would never again "hear a bird sing," "see a sunset," "taste an apple, a cup of coffee or a Coca Cola," "walk in the spring rain," "learn that the world perhaps does have a place for each of them," "hold a hand," or put a "key in the door and have one say: Are you home?" As we stated in *Haskett, supra,* 30 Cal.3d at page 863, in which the prosecutor, in his penalty phase argument, invited the jurors to "put themselves in the [victim's] shoes": "[A]t the penalty phase the jury decides a question, the resolution of which turns not only on the facts, but on a jury's moral assessment of those facts as they reflect on whether the defendant should be put to death. It is not only appropriate, but necessary, that the jury weigh the sympathetic elements of defendant's background against those that may offend the conscience."

We followed *Haskett* in *Medina, supra,* 11 Cal.4th at page 777, in which the prosecutor, during the penalty phase, argued to the jury the terror the victim must have felt while lying on the ground awaiting execution. What we stated in *Medina* applies here as well: "[T]he prosecutor's argument did not exceed the bounds of propriety." (*Id.* at p. 778.)

E. *Instruction That a Death Verdict Will Result in Death*

 Defendant claims that it was error for the trial court, at the request of defense counsel, to instruct the jury that "[i]f you find that a verdict of death is appropriate, you must assume that such penalty will be imposed," without giving a similar instruction regarding a sentence of life without the possibility of parole. This contention is without merit.

As we have explained in prior cases, because of the possibility of appellate reversal or gubernatorial commutation or pardon, it would be erroneous to instruct the jury that if it returns a death verdict, the sentence of death will inexorably be carried out. But the trial court may give such an instruction at the defendant's request. (*People v. Kipp* (1998) 18 Cal.4th 349, 378-379 [75 Cal.Rptr.2d 716, 956 P.2d 1169] [citing cases].) The trial court, therefore, did not err in instructing the jury, at defendant's request, to assume that a verdict of death would be carried out.

 We have also rejected the argument that the trial court is required to instruct the jury to assume that a verdict of life without the possibility of parole really does mean life without the possibility of parole. As we stated in *People v. Sanders* (1995) 11 Cal.4th 475, 562 [46 Cal.Rptr.2d 751, 905 P.2d 420]: " 'When a term is commonly understood by those familiar with the English language and is not used in a technical sense peculiar to the law, the court is not required to give an instruction as to its meaning in the absence of a request. [Citation.] In this case, the term "confinement in the state prison for life without possibility of parole" was used in the common and nontechnical sense that the plain meaning of the words convey. Accordingly, the court was not required to give an instruction as to its meaning sua sponte.' [Citation.]" In the present case, defendant did not request such an instruction, nor was the court required to give the same. This contention is without merit.

F. *Instruction on Lesser Included Offenses*

Defendant contends that CALJIC No. 17.10, the jury instruction that requires a unanimous acquittal of the charged offense prior to a verdict on a lesser offense, violated his due process and Eighth Amendment rights to a full jury consideration of lesser offenses. This precise issue has been repeatedly rejected by this court. (See, e.g., *People v. Dennis* (1998) 17 Cal.4th 468, 535-537 [71 Cal.Rptr.2d 680, 950 P.2d 1035]; *People v. Fields* (1996) 13 Cal.4th 289, 303-305 [52 Cal.Rptr.2d 282, 914 P.2d 832].) We see no reason to revisit the issue here.

G. *Jury's Request*

During deliberations, the jury requested a copy of Dr. Edwards's report. This report was referred to in the testimony of Dr. Globus, a defense

psychologist. The trial court correctly informed the jury that, because the report was not in evidence, it was not available to the jury. The court volunteered that the jury could have the court reporter read back Dr. Globus's entire testimony, but not only the aspects that related to the report. The jury was given the night to reflect upon this situation. The next morning, the jury did not renew its request. Instead, it resumed deliberations and returned a death verdict later that day.

■ We have interpreted Penal Code section 1138 to provide that " 'the trial court must satisfy requests by the jury for rereading of testimony.' " (*People v. Box* (2000) 23 Cal.4th 1153, 1213 [99 Cal.Rptr.2d 69, 5 P.3d 130], quoting *People v. Ainsworth* (1988) 45 Cal.3d 984, 1020 [248 Cal.Rptr. 568, 755 P.2d 1017].)[7] This statutory right is not of constitutional dimension, since "[t]he rereading of testimony is not a critical stage of the proceedings." (*Ayala, supra,* 23 Cal.4th at p. 288.) Because the jury here never made a request to have the testimony reread, there was no statutory violation. Instead, the jury requested a report that was not in evidence; the jury never thereafter responded to the court's suggestion that the entire testimony be read back.

The suggestion by defendant that the trial court's decision not to permit the reading of portions of the testimony of a witness amounted to "jury coercion" is without merit. The trial court made it clear, prior to trial, that rereading a portion of a witness's testimony was not permitted because testimony could then be taken out of context. This decision was well within the sound discretion of the court. We recently rejected this very argument in *People v. Hillhouse* (2002) 27 Cal.4th 469, 506-507 [117 Cal.Rptr.2d 45, 40 P.3d 754]: "[D]efendant argues the court erred in advising the jury it would hear the entire testimony of any given witness. This portion of the instruction did not violate section 1138 [of the Penal Code]. That statute mandates the readback of testimony at jury request, but it does not forbid giving the jury more than it requests so it also receives the context. Defendant speculates the jury may have wanted a rereading of some part of [the witness's] testimony but chose not to request it because the entire testimony was lengthy. . . . But in any event, the court made clear it *would* provide any requested rereading of material testimony. Merely informing the jury of the time it may take for rehearing testimony is not impermissible jury coercion. [Citation.]"

Moreover, in the present case, the jury had had the entirety of Joanna's and Darlene's testimony reread, which entailed over two days of rereading.

---

[7]Penal Code section 1138 provides, in relevant part: "After the jury has retired for deliberation, if there be any disagreement between them as to the testimony, . . . they must require the officer to conduct them into court [and] the information required must be given in the presence of [the prosecutor] and the defendant or his counsel . . . ."

This jury, therefore, was quite capable of requesting extensive readback. It did not. *People v. Warren* (1900) 130 Cal. 678, 681-682 [63 P. 87], and *People v. Slaughter* (1917) 33 Cal.App. 365, 378-379 [165 P. 44], are on point. In each case, the trial court informed the jury that the requested readback would take hours; thereafter each jury reached a verdict without hearing the requested readback. Our court and the Court of Appeal found no violation of Penal Code section 1138. Based on the foregoing authority, we similarly find no error here.

## H. *Description of an Execution*

■ Defendant claims that it was error for the trial court to prohibit the introduction of evidence describing how the death penalty is administered. This contention is without merit. We have consistently held that evidence of the manner in which the death penalty is carried out is irrelevant to our capital sentencing scheme. (See, e.g., *People v. Lucas* (1995) 12 Cal.4th 415, 499 [48 Cal.Rptr.2d 525, 907 P.2d 373]; *People v. Fudge* (1994) 7 Cal.4th 1075, 1123-1124 [31 Cal.Rptr.2d 321, 875 P.2d 36]; *People v. Daniels* (1991) 52 Cal.3d 815, 877-878 [277 Cal.Rptr. 122, 802 P.2d 906].)

## I. *Constitutional Challenges to California's 1978 Death Penalty Law*

In *People v. Snow* (2003) 30 Cal.4th 43 [132 Cal.Rptr.2d 271, 65 P.3d 749] (*Snow*), we again upheld the constitutionality of the 1978 death penalty scheme. And as we said in *People v. Clair* (1992) 2 Cal.4th 629, 691 [7 Cal.Rptr.2d 564, 828 P.2d 705] (*Clair*): " 'Having time and again considered [such] claims . . . in a series of decisions beginning with *People v. Rodriguez* (1986) 42 Cal.3d 730, 777-779 [230 Cal.Rptr. 667, 726 P.2d 113], we may summarize the views expressed therein thus: as a general matter at least, the 1978 death penalty law is facially valid under the federal and state charters. . . . [D]efendant raises certain specific constitutional challenges. But he recognizes that in the *Rodriguez* series of cases, we have rejected each and every one.' [Citation.]" We now turn to each of the challenges.

### 1. *Proportionality of Defendant's Sentence*

#### a. *Disproportionality*

■ Defendant claims that the application of the death penalty in his case is disproportionate to his personal culpability and is therefore cruel or unusual punishment, in violation of article I, section 17 of the California Constitution. ■ To determine whether a sentence is cruel or unusual as

applied to a particular defendant, a reviewing court must examine the circumstances of the offense, including the defendant's motive, the extent of the defendant's involvement in the crime, the manner in which the crime was committed, and the consequences of the defendant's acts. The court must also consider the defendant's age, prior criminality and mental capabilities. (*People v. Hines* (1997) 15 Cal.4th 997, 1078 [64 Cal.Rptr.2d 594, 938 P.2d 388].) If the court concludes that the penalty imposed is "grossly disproportionate to the defendant's culpability" (*People v. Dillon* (1983) 34 Cal.3d 441, 479 [194 Cal.Rptr. 390, 668 P.2d 697]) or, stated another way, that the punishment shocks the conscience and offends fundamental notions of human dignity (see, e.g., *People v. Cox* (1991) 53 Cal.3d 618, 690 [280 Cal.Rptr. 692, 809 P.2d 351]), the court must invalidate the sentence as unconstitutional.

 Applying these principles, the imposition of the death penalty on defendant is neither cruel nor unusual. Defendant, with premeditation and deliberation, brutally murdered three teenage girls, on three separate occasions, and left their unclothed bodies in the woods. Never has defendant expressed remorse for the murders. While defendant may have suffered abuse as a child and at times drank too much, there is no evidence to suggest that these three cold-blooded murders were committed under any emotional disturbance. Given these facts alone, defendant's sentence is not disproportionate to his personal culpability.

b. *Comparative Proportionality Review*

 Comparative proportionality review, which requires a comparative or intercase proportionality review of other murder cases to determine the defendant's relative culpability, is not required by the United States Constitution. (*Pulley v. Harris* (1984) 465 U.S. 37, 50-51 [104 S.Ct. 871, 879-880, 79 L.Ed.2d 29].) We have repeatedly rejected such a challenge. (See, e.g., *Burgener, supra,* 29 Cal.4th at p. 884, fn. 7; *People v. Ochoa* (2001) 26 Cal.4th 398, 458 [110 Cal.Rptr.2d 324, 28 P.3d 78]; *People v. Coddington* (2000) 23 Cal.4th 529, 656 [97 Cal.Rptr.2d 528, 2 P.3d 1081]; *People v. Webb* (1993) 6 Cal.4th 494, 536 [24 Cal.Rptr.2d 779, 862 P.2d 779], and cases cited therein.) We have also rejected the claim advanced by defendant that equal protection requires us to provide capital defendants with the same sentence review afforded other felons under the determinate sentencing law. (Pen. Code, § 1170, subd. (f); see, e.g., *People v. Lewis* (2001) 26 Cal.4th 334, 395 [110 Cal.Rptr.2d 272, 28 P.3d 34]; *People v. Jenkins, supra,* 22 Cal.4th at p. 1053; *People v. Bacigalupo* (1991) 1 Cal.4th 103, 151 [2 Cal.Rptr.2d 335, 820 P.2d 559].)

### 2. *The Statutory Death Eligibility Process*

Defendant asserts California's homicide and death penalty statutes do not sufficiently narrow the class of homicide offenders eligible for the death penalty. We have rejected this claim in numerous decisions and decline to conclude differently here. (See, e.g., *Burgener, supra,* 29 Cal.4th at pp. 884-885; *People v. Hughes* (2002) 27 Cal.4th 287, 404 [116 Cal.Rptr.2d 401, 39 P.3d 432]; *People v. Bolin* (1998) 18 Cal.4th 297, 345 [75 Cal.Rptr.2d 412, 956 P.2d 374]; *People v. Barnett* (1998) 17 Cal.4th 1044, 1179 [74 Cal.Rptr.2d 121, 954 P.2d 384], and cases cited; *People v. Scott* (1997) 15 Cal.4th 1188, 1228 [65 Cal.Rptr.2d 240, 939 P.2d 354].) Defendant also asserts that the prosecutorial discretion permitted under our statutes renders California's death eligibility process unconstitutional. Again, we have rejected this claim in numerous decisions and decline to reconsider them now. (See, e.g., *Hughes, supra,* 27 Cal.4th at p. 404; *Bolin, supra,* 18 Cal.4th at p. 345; *Barnett, supra,* 17 Cal.4th at p. 1179, and cases cited; *Scott, supra,* 15 Cal.4th at p. 1228.)

### 3. *Aggravating Circumstances*

Defendant claims that it is unconstitutional to impose a sentence of death unless the aggravating circumstances outweigh the mitigating circumstances beyond a reasonable doubt. This claim was first rejected by our court in *People v. Rodriguez, supra,* 42 Cal.3d at pages 777-779, and has been rejected ever since. (See, e.g., *Snow, supra,* 30 Cal.4th at pp. 125-127; *Burgener, supra,* 29 Cal.4th at p. 884, fn. 7; *People v. Gutierrez* (2002) 28 Cal.4th 1083, 1150-1151 [124 Cal.Rptr.2d 373, 52 P.3d 572]; *Clair, supra,* 2 Cal.4th at p. 691.) ▮ As we recently stated: "The Constitution does not require the jury to find beyond a reasonable doubt that a particular factor in aggravation exists, that the aggravating factors outweighed the mitigating factors, or that death was the appropriate penalty." (*Burgener, supra,* 29 Cal.4th at p. 884.)

Defendant, however, asks us to reconsider this position in light of two recent United States Supreme Court cases, *Apprendi v. New Jersey* (2000) 530 U.S. 466 [120 S.Ct. 2348, 147 L.Ed.2d 435], and *Ring v. Arizona* (2002) 536 U.S. 584 [122 S.Ct. 2428, 153 L.Ed.2d 556]. Specifically, defendant argues that the two cases read together mandate that the aggravating circumstances necessary for the jury's imposition of the death penalty be found beyond a reasonable doubt. We disagree. As this court recently stated in *Snow, supra,* 30 Cal.4th at page 126, footnote 32: "We reject that argument for the reason given in *People v. Anderson* [(2001)] 25 Cal.4th [543,] 589-590, footnote 14 [106 Cal.Rptr.2d 575, 22 P.3d 347]: '[U]nder the

California death penalty scheme, once the defendant has been convicted of first degree murder and one or more special circumstances has been found true beyond a reasonable doubt, death *is* no more than the prescribed statutory maximum for the offense; the only alternative is life imprisonment without possibility of parole. (§ 190.2, subd. (a).) Hence, facts which bear upon, but do not necessarily determine, which of these two alternative penalties is appropriate do not come within the holding of *Apprendi*.' The high court's recent decision in *Ring v. Arizona* [, *supra*,] 536 U.S. 584 [122 S.Ct. 2428] does not change this analysis. Under the Arizona capital sentencing scheme invalidated in *Ring*, a defendant convicted of first degree murder could be sentenced to death if, and only if, the trial court first found at least one of the enumerated aggravating factors true. (*Id.* at p. 603 [122 S.Ct. at p. 2440].) Under California's scheme, in contrast, each juror must believe the circumstances in aggravation substantially outweigh those in mitigation, but the jury as a whole need not find any one aggravating factor to exist. The final step in California capital sentencing is a free weighing of all the factors relating to the defendant's culpability, comparable to a sentencing court's traditionally discretionary decision to, for example, impose one prison sentence rather than another. Nothing in *Apprendi* or *Ring* suggests the sentencer in such a system constitutionally must find any aggravating factor true beyond a reasonable doubt." (Accord, *People v. Smith* (2003) 30 Cal.4th 581, 642 [134 Cal.Rptr.2d 1, 68 P.3d 302]; *People v. Prieto* (2003) 30 Cal.4th 226, 275 [133 Cal.Rptr.2d 18, 66 P.3d 1123].)

### J. *Automatic Motion for Modification of Death Verdict*

Under Penal Code section 190.4, subdivision (e), the trial court is required to "review the evidence, consider, take into account, and be guided by the aggravating and mitigating circumstances referred to in Section 190.3, and shall make a determination as to whether the jury's findings and verdicts that the aggravating circumstances outweigh the mitigating circumstances are contrary to law or the evidence presented. The judge shall state on the record the reason for his findings."

Defendant claims a remand is required because it was error for the judge to (1) consider that defendant possessed firearms under Penal Code section 190.3, factor (a); (2) consider that defendant possessed knives and guns under section 190.3, factor (b); (3) double-count the crimes of which he was convicted under section 190.3, factors (a) and (b); (4) not consider defendant's brain damage under section 190.3, factors (d) and (h); and (5) not consider other mitigating factors under section 190.3, factor (k). We disagree.

Upon this record, it is clear the judge took this review seriously and painstakingly went through each of the aggravating and mitigating factors.

He concluded that "the jury's findings and verdicts are not only supported by the weight of the evidence, but the court in its independent review of all the evidence" found that "the aggravating circumstances overwhelmingly outweigh the mitigating factors."

As to defendant's specific claims of error, because it was proper to admit evidence that defendant possessed guns and knives, it was not error for the trial court to consider this evidence. As to the court's lack of discussion regarding brain damage, the trial court properly could have accepted the testimony of the neuropsychologist, Dr. Vogt, that there was no evidence of brain damage.

In *People v. Miranda* (1987) 44 Cal.3d 57, 105-106 [241 Cal.Rptr. 594, 744 P.2d 1127], we held that the criminal activity to be considered under Penal Code section 190.3, factor (b) does not include the circumstances of the crime for which the defendant is being prosecuted in the current proceeding. Here, the court correctly considered the circumstances of the current crime as a factor under section 190.3, factor (a) but incorrectly used these same circumstances as an aggravating factor under section 190.3, factor (b). The court also incorrectly stated that the mere possession of guns constituted a crime of violence. The court's two errors were harmless. Given the willful, premeditated, deliberate murder of the three teenage girls, it is not reasonably possible that such errors affected the trial court's decision to deny the automatic motion to modify the verdict. (See, e.g., *Williams, supra,* 16 Cal.4th at p. 283; *People v. Clark, supra,* 3 Cal.4th at pp. 171-172.) No basis for a remand appears.

## V. DISPOSITION

The judgment of death is affirmed.

George, C. J., Baxter, J., Werdegar, J., Chin, J., and Brown, J., concurred.

**KENNARD, J.,** Dissenting.—Because I would grant defendant's petition for writ of habeas corpus in the companion case of *In re Cox* (2003) 30 Cal.4th 974 [135 Cal.Rptr.2d 315, 70 P.3d 313], I would dismiss this automatic appeal as moot.