Filed 10/29/21  P. v. Thomas CA2/3
Opinion following transfer from Supreme Court

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | B288172 |
| Plaintiff and Respondent, | Los Angeles County |
| v. | Super. Ct. No. BA432214-02 |
| LAVON TEVELL THOMAS, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Curtis B. Rappe, Judge.  Affirmed.

Danalynn Pritz, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Steven D. Matthews and Roberta L. Davis, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted Lavon Tevell Thomas of first degree murder and second degree robbery, and found true allegations that Thomas was armed with a firearm, committed the murder during the robbery, and personally and intentionally discharged the firearm, and that the crimes were gang-related.

Among other contentions, Thomas argues the trial court erred by instructing the jury to consider an eyewitness's certainty in evaluating the accuracy of an identification under CALCRIM No. 315. We initially rejected this challenge, recognizing that at "the time of [Thomas's] trial, at least two California Supreme Court decisions had upheld the inclusion of the certainty language in the instruction." After we filed our opinion, the Supreme Court granted review in this matter and decided *People v. Lemcke* (2021) 11 Cal.5th 644 (*Lemcke*), concluding the certainty instruction does not violate due process, but "acknowledg[ing] the current version of the instruction might confuse jurors about the relationship between confidence and accuracy" of an identification. (*Id.* at pp. 661, 666.) Our high court then transferred the matter back to this court with directions to vacate our initial opinion and reconsider the cause in light of *Lemcke*. The parties filed supplemental briefs discussing Thomas's instructional error argument and the *Lemcke* opinion. (See Cal. Rules of Court, rule 8.200(b)(1).)

We have considered the parties' supplemental briefs and conclude, consistent with *Lemcke*, Thomas's due process rights were not violated and he was not prejudiced by the instruction in any event. We affirm.

2

# BACKGROUND

An amended information charged Thomas with murder (Pen. Code,[1] § 187, subd. (a)) (count 1) and second degree robbery (§ 211) (count 2). In count 1, the information alleged that a principal was armed with a firearm (§ 12022, subd. (a)(1)), and the murder was committed during a robbery (§ 190.2, subd. (a)(17)). In both counts 1 and 2, the information alleged Thomas personally and intentionally discharged a firearm causing death (§ 12022.53, subds. (b)–(d)), and the crimes were gang-related (§ 186.22, subd. (b)(1)(C)). The prosecution did not seek the death penalty. Thomas pleaded not guilty. After trial, a jury found him guilty of first degree murder in count 1 and second degree robbery in count 2, and found all the allegations true. The court sentenced Thomas to life without the possibility of parole (LWOP) and 25 years to life for the firearm enhancement on count 1, staying the sentence on count 2 under section 654. Thomas filed a timely notice of appeal.

## 1. *The robbery and murder*

On the night of November 2, 2014, 20-30 costumed guests between 35 and 50 years old were drinking alcohol and enjoying themselves at a Halloween party on West 77th Street in Los Angeles, at the house of Sandra Neeley. Neeley's sister and co-host Sonja Wheeler, Wheeler's boyfriend Darren Paul, and Paul's cousin Lisa Bryant also attended the party.

A planned photograph booth had been cancelled because of rain. Don Sims, Jr., and Adam Blair arrived, intoxicated and not in costume. After saying hello, Sims began photographing

---

[1]     Statutory references are to the Penal Code unless otherwise indicated.

the guests, using a camera with a large screen that displayed the photographs. The hired deejay, William Norman, knew Sims and Blair, and Neeley told Wheeler she had invited them.

Toward the end of the party, Bryant called her daughter Ralisha Pettaway, and then went outside. Sims walked out behind her. Paul told Bryant, Sims had been " 'taking pictures of your pussy, your ass and your titties,' " and Bryant asked to see the photographs. Pettaway drove up in her black Dodge Charger, and Bryant walked up to the open driver's side window. She could not see anyone else in the car because the windows were tinted. After Sims showed Bryant a full body shot, zooming in on her private parts, Bryant and Pettaway asked him to delete the photograph and other inappropriate images, and Sims refused. Paul also was upset when he saw some of the photographs of Wheeler and other women.

Bryant went back into the house to retrieve her purse and Sims also went back inside. When Bryant came back outside to put things in her car, she walked down the street to where Pettaway had parked the Charger. Sims was sitting in his white Jeep next to the Charger. Pettaway was asking Sims if he had deleted the photographs, and he said not yet. Other partygoers streamed outside and began to yell, demanding that Sims delete the photographs. Sims first refused, and then told Bryant he would delete the photographs; but after going through them on his camera, he said: " 'Fuck that, I ain't deleting nothing. Fuck all you bitches.' " Paul, Norman, and others continued to ask him to delete the photographs and Sims refused. Several arguments continued for about 10 minutes, and Bryant heard Sims's friend Blair say some "gang stuff," including the words "Blood" and "Inglewood Family." Bryant told Paul not to confront Sims.

As she and Paul began to walk away, Bryant heard what sounded like a gunshot. She ran, got into her car, and left, at some point calling Pettaway to check on her.

A security video showed Pettaway's Charger pulling up next to the Jeep. Pettaway got out of the driver's side, and a man Bryant didn't know, wearing a dark hoodie, got out of the passenger side. Pettaway and the man argued with Sims, and the man got back into the Charger. Then Pettaway reentered the Charger, and the man got out and walked to the back of the Jeep. The video showed a flash, and the man returning to the passenger seat of the Charger. Bryant was not sure whether the man was Thomas.

Pettaway testified she had been dating Thomas for a year, but Bryant (her mother) had never met him. He was in the passenger seat of the Charger when she arrived at the end of the party. She had not come earlier because she was pregnant by Thomas and suffering from morning sickness. When Pettaway saw the provocative photographs, she asked Sims to delete them and he refused. After Sims came back out and got into his Jeep, Pettaway got a bottle out of her trunk, walked down the street, and threw the bottle at his car. She then drove over to the Jeep, and she and Thomas got out of the car and argued with Sims, who again refused to delete the photographs. Partygoers, including Bryant, Paul, and Wheeler, joined in the argument. Pettaway turned around to talk to a friend, and heard a shot. She and Thomas got back into the Charger and she drove away. She did not see a gun or a camera. She drove to Thomas's house, where they smoked weed.

For "safety reasons," Pettaway initially told the police she was alone in the Charger. She did not want to involve anyone

5

or to snitch on Thomas, who was a member of the Brims gang and went by "Evil." She kept her relationship with Thomas secret because her boyfriend, a former Inglewood Family member also known as "Evil," was jailed in another state. Pettaway was charged jointly with Thomas. She pleaded guilty to robbery and admitted a principal was armed with a firearm. She received a six-year prison sentence, on the condition that she testify truthfully at Thomas's trial.

Paul testified he was out near the Jeep, trying and failing to convince Sims to delete the photographs. Sims was holding the camera, and Sims and Blair were cursing and laughing. Blair said, " 'I'll make a phone call and I'll have my boys come over here,' " and said something about "Brims," "Blood," and "Inglewood." Norman then came out and got involved. Just as Paul walked away, he heard a pop. Paul did not see who fired the shot, and did not see Thomas that night.

Wheeler testified that after Sims started taking photographs at the party, she left to check on her son. When she returned, people were down the street arguing, saying, " '[d]elete the pictures.' " She heard Blair say "Brim." Wheeler tried to get everyone to come back inside so they would not disturb the neighbors, and asked Norman to help her. As she walked back to the house she heard a shot, turned around, and saw Sims fall out of the Jeep and onto the ground. She did not know Sims or Blair before the party, and did not recognize Thomas when she saw him in court.

Norman testified he was hired as a deejay and did not drink alcohol at the party. He knew Sims and Blair. Toward the end of the party, Norman overheard Bryant on the phone, sounding upset and saying something about photographs on

Sims's camera.[2] Sims came in and told Blair, " '[l]et's go,' " and they left. Shortly after, Norman heard arguing and walked outside to the Jeep. Sims sat in the driver's seat with the camera on his lap.

Norman stood inside the V-shape of the Jeep's open door and asked Sims what was going on; Sims wouldn't tell him. A woman behind Norman was saying, " 'Give up the camera.' " Suddenly, Norman saw a red laser light on Sims's chest. Blair was arguing with a man, saying, " '[t]his is family,' " and the man said: " 'F this, this is Brims.' " Norman told Blair to shut up and stay low, but Blair said he didn't care. Norman told Sims to give up the camera and Sims refused. The man who had been arguing with Blair came up right behind Norman and pointed a gun at Sims's head. Sims said: " 'Get the gun out of my face, cuz,' " and slapped the gun down. Norman backed up and said: " 'Give up the camera. This dude got a gun.' " Suddenly, Norman felt the man with the gun brush past him to grab the camera out of Sims's lap, hitting Norman in the stomach. Sims started to get out of the car, and "the guy . . . just shot, and that's when [Sims] just fell face first." A woman's voice said " '[g]et in the car, get in the car,' " and Norman ran away.

Norman described the gun as a small revolver with a laser sight, maybe a .38 snubnose. Asked at trial if the gun that killed Sims looked something like the gun that Thomas held in a photograph marked as Exhibit 25, Norman said he couldn't

---

[2] The parties stipulated that Norman's brother George would testify that around 30 minutes before the shooting, he heard Bryant on the phone saying: "You need to hurry up and get here. He is getting ready to leave," just before Bryant walked outside with Sims.

tell because the photograph was foggy ("I can't really see that picture."). The red dot on Thomas's hand in the photograph, however, looked like the red light he saw on Sims's chest that night. Norman did not recognize Thomas as the shooter, but thought he had similar characteristics.

Blair testified he arrived at the party with his friend Sims and drank a cup of Hennessey. Blair followed Sims when he headed outside about an hour and a half later. Blair saw three women and a man arguing with Sims, who was sitting in the driver's seat of his white Jeep with the door open. The argument went on for 10 to 15 minutes, with the women saying, " '[d]elete the pictures off the camera.' " Blair joined in, saying, " '[t]his is family,' " meaning he would handle it and Sims was like family to him; Blair was not an Inglewood Family member and did not intend a gang reference. When Blair turned to tell Sims to delete the photographs, he saw Thomas pull out a black snub-nose infrared revolver that looked like a .38. Blair knew the gun had a laser because it was nighttime and he saw the laser dot on Sims's forehead. Thomas extended his arm and shot Sims in the head. Thomas then hopped into the passenger side of a car facing in the opposite direction to the Jeep, and the car drove off. Later, Blair circled the first photograph in a six-pack photographic lineup and said it was the shooter; the photograph was of Thomas, and Blair also identified Thomas in court as the shooter.

Blair testified the firearm in the Exhibit 25 photograph looked "Similar. I believe it was black, like I said." Asked whether the handle was black, Blair testified: "[I]t was kind of hard, nighttime. . . . I am not really looking at the handle, I am looking at the infrared beam being pointed at [Sims]."

The barrel of the gun was black. Blair agreed the gun in Exhibit 25 had a silver barrel.

The police never found the camera or the gun, and recovered no physical evidence from the scene. The medical examiner who examined the body testified Sims died from a gunshot wound to the top of his head on the left side. She recovered the bullet from Sims's neck.

The prosecution's firearms expert testified that the bullet retrieved from Sims's neck was a .38 caliber class consistent with a nine millimeter, a .38, or a .357 magnum weapon. The rifling on the exterior of the bullet showed five lands and five grooves, and the bullet rifled to the right. Smith and Wesson was one of the three most common manufacturers whose guns would produce the rifling on the bullet, and the "five right" characteristic was very typical of Smith and Wesson. The vast majority of the gun models that could have fired the bullet were revolvers. Both revolvers and semi-automatic pistols came in silver and black, and both could have built-in or aftermarket laser sights. The casing stays in a revolver after the bullet is fired.

Shown Exhibit 25, the photograph of Thomas holding a gun, the expert testified: "I don't know exactly what this gun-shaped object is, but if it is a working firearm, it appears to be a small, snub-nosed revolver, and they do come in a variety of calibers." It was possible a laser was attached. She could not state with scientific certainty anything about the firearm in the photograph, but it could not be ruled out as the weapon that fired the bullet. "This picture is fairly grainy. It's hard to determine very much out of it."

9

## 2. *Gang evidence*

LAPD Officer Joshua Medina had contacted Thomas in Brims territory many times. On May 21, 2013, Thomas admitted he was a Brims member with the moniker "Evil," showing Officer Medina his Brims tattoos. Brims was an older clique of the Bloods gang. Inglewood Family was also a Bloods gang. Officer Medina was not aware of any rivalry between Inglewood Family and Brims, both of which were rivals of the Rollin' 60s Crip gang.

Gang expert Officer Patrick Lane testified Brims territory was around Harvard Park, and the gang enforced its territory with violence such as murders, shootings, and assaults with a deadly weapon. The Brims gang color was red, and they used sports teams on their logos (San Diego Padres or SD, for the Six Deuce or 62 subset, and Boston Red Sox or B, for Bloods), the Bentley logo, and hand gestures. The 62 Brims had about 150 active members. The Halloween party was in the territory of the 83rd Street Gangster Crips (Eight Trey), who generally got along with the Brims, as did the Inglewood Family gang. Gang culture was about respect, and if a Brims was in Eight Trey territory and something happened, the Brims member would identify himself, to take credit as an individual, to inspire fear of the gang, and to intimidate witnesses.

Officer Lane knew from his more than 10 contacts with Thomas, Thomas's own admission, his tattoos, items found in his home, and photographs, that Thomas was a Six Deuce Brims called "Evil Brim" or "Baby Evil." The gang's primary activities were residential burglaries, shootings, murders, and assaults with a deadly weapon, and gang members had committed predicate offenses. Given a hypothetical tracking the events at the Halloween party, Officer Lane opined the robbery and

10

shooting was for the benefit of the Brims, because the Brims gang name was thrown out in response to "Family" as the situation escalated. The victim had provoked and challenged the shooter by slapping the gun away and by saying "cuz," a term used by Crips members. The shooter had to react so not to appear weak. Taking the camera would intimidate others and provide money to support future Brims criminal activity.

## 3. *Defense evidence*

When Detective Iris Romero booked Pettaway after her arrest on December 15, 2014, Pettaway asked whether someone named "Keanon" was also being arrested and questioned. Pettaway later clarified she was asking about Darren Paul.

Lead investigator Detective Mark Hahn testified he showed Blair a photographic lineup and Blair said Thomas's photograph " 'really looks like [the shooter].' " Blair described the shooter as a little taller than he was and shorter than Detective Hahn, who was almost six feet tall. Thomas stood up in court to show he was taller than Detective Hahn. Detective Hahn believed Pettaway lied when she told him she drove to the party alone, as the surveillance video showed someone else leave and return to the car. The video also showed that before the police arrived, Blair moved Sims's body, and reached into the white Jeep three times.

## DISCUSSION

## 1. *The admission of People's Exhibit No. 25 did not violate due process*

People's Exhibit No. 25 showed three photographs retrieved from Thomas's cell phone. The photograph in issue on appeal shows Thomas, wearing all red and sitting on a couch, holding what appears to be a gun in his right hand and pointing it at his left hand, which is making a Crips gang sign. A red dot is visible

11

on his left hand.  Thomas moved to exclude the photograph, arguing that without evidence that it was taken before Sims was shot, it was not relevant; there was no evidence that the gun was the murder weapon, making the photograph more prejudicial than probative; and the photograph was improper character evidence.  The court responded that it went to the weight of the evidence, not its admissibility, and in the photograph Thomas looked around the same age (18) as at the time of the crime.  The prosecutor explained the firearms expert would not testify the gun was the murder weapon, but would not rule it out.  The court admitted the photograph, stating the weight of the evidence was for the jury to decide.

In closing, the prosecutor argued Blair said the gun in the photograph was like the .38 snubnose with a laser that killed Sims.  The .38 snubnose was a small caliber revolver, like most of the firearms that could have discharged the bullet retrieved from Sims's body.  In the photograph Thomas pointed a small revolver with a laser sight at a Crips symbol, showing his commitment to the gang, and "[t]he gun and scientific evidence matches a photograph very similar to the photograph of defendant with a gun."  The defense argued the photograph was intended to make the jury dislike Thomas and to steer them away from the truth.  Blair testified the gun was black, so the photograph did not connect Thomas to the crime.  In rebuttal, the prosecutor argued it was no coincidence that the photograph showed Thomas dressed in red and holding a small caliber gun with a laser.  The bullet "tie[d] into" the photograph and the scientific evidence that a small caliber gun shot the bullet that killed Sims.

Thomas argues the court abused its discretion in admitting the photograph because it was not relevant, citing *People v. Riser* (1956) 47 Cal.2d 566. *Riser* held: "When the specific type of weapon used to commit a homicide is not known, it may be permissible to admit into evidence weapons found in the defendant's possession some time after the crime that could have been the weapons employed. There need be no conclusive demonstration that the weapon in defendant's possession was the murder weapon. [Citations.] When the prosecution relies, however, on a specific type of weapon, it is error to admit evidence that other weapons were found in his possession, for such evidence tends to show, not that he committed the crime, but only that he is the sort of person who carries deadly weapons." (*Id.* at p. 577.)

In this case the murder weapon was never found. Witnesses testified the gun was a small revolver with a laser sight. The expert testified the photograph appeared to show a small revolver that could have fired the bullet that killed Sims. The prosecution argued the gun in the photograph could have been the murder weapon. Our Supreme Court recently addressed similar facts: "[T]he murder weapon was never found, but the evidence showed it was likely a nine-millimeter firearm. The firearm the witnesses testified about could easily have been the one used in the murders. 'Although the witnesses did not establish the gun necessarily was the murder weapon, it might have been. Unlike *People v. Riser*, *supra*, 47 Cal.2d at page 577, this evidence did not merely show that defendant was a person who possesses guns, but showed he possessed a gun that might have been the murder weapon . . . . The evidence was thus relevant and admissible as circumstantial evidence that he

13

committed the charged offenses.' (*People v. Carpenter* (1999) 21 Cal.4th 1016, 1052 [ ]; see *People v. Cox* (2003) 30 Cal.4th 916, 956 [ ] [similar].) [¶] Evidence that shortly before the murders defendant possessed a firearm that could have been the murder weapon was similarly relevant and admissible as circumstantial evidence that he committed the murders. Contrary to defendant's additional argument, we see no abuse of discretion in not excluding the evidence as unduly prejudicial under Evidence Code section 352." (*People v. Sanchez* (2019) 7 Cal.5th 14, 55–56.)

Thomas argues the prosecution failed to establish when the photograph was taken; the gun expert could not say with scientific certainty that the gun Thomas held in the photograph was the same caliber as the murder weapon, or that the gun in the photograph had a laser sight; and the gun in the photograph was a different color than the murder weapon. First, as the court noted, in the photograph Thomas appeared to be around the same age he was at the time Sims was murdered. Second, the gun expert testified that she could not rule out the gun in the photograph as the murder weapon. She was not required to testify with "scientific certainty" that it was. Third, Blair testified the revolver used to shoot Sims had a black barrel, and the gun in the photograph had a silver barrel. Norman testified he saw a small revolver at the time of the shooting. Norman described the photograph as so "foggy" that he couldn't see the gun clearly, although he could see the red laser dot; he said nothing about the color of the gun that killed Sims or the gun in the photograph. The firearm expert said the photograph was so grainy that she could not tell exactly what the gun-shaped

14

object was, but it appeared to be a small snub-nosed revolver that could have fired the bullet that killed Sims.

We have reviewed Exhibit 25. The photograph shows Thomas holding a gun that may at least in part be silver, although the color of the barrel is unclear. The bad quality of the photograph, and the equivocal testimony about the color of the gun, diminishes the weight of the photograph as evidence that the gun in the photograph was the murder weapon, but it does not eliminate the possibility that it was.

Thomas faced more than the charges of robbery and murder. He also faced allegations that he robbed and murdered Sims for the benefit of a street gang. The photograph was relevant to show that Thomas was a Brims member (his red clothing) whose rivals were Crips (he pointed the weapon at his left hand making a Crips gang sign). The photograph therefore was not simply bad character evidence related to the murder charge. (*People v. Prince* (2007) 40 Cal.4th 1179, 1249 [knives not used to murder victims bore some relevance to weapons used in other charged crimes and were admissible]; *People v. Cox* (2003) 30 Cal.4th 916, 956–957.) The "circumstantial relevancy" of the photograph in Exhibit 25 is clear, even if the gun shown was not used in the killing, and the court did not abuse its discretion in admitting the photograph into evidence. (*People v. Lane* (1961) 56 Cal.2d 773, 785.) Because the court did not abuse its discretion in admitting the evidence, there was no constitutional error. (*People v. Winbush* (2017) 2 Cal.5th 402, 458.)

## 2. *The instruction on witness certainty did not violate due process*

Thomas argues the trial court erred and violated his due process rights by giving the portion of CALCRIM No. 315 that instructs the jury to consider, when evaluating identification testimony, "How certain was the witness when he or she made an identification?" Thomas points to scientific studies and case law recognizing a weak correlation between a witness's certainty and the accuracy of a witness's identification.

In our original opinion, we concluded there was no error, relying on two California Supreme Court decisions that upheld the instruction's certainty language. (See *People v. Sánchez* (2016) 63 Cal.4th 411, 461–463; *People v. Johnson* (1992) 3 Cal.4th 1183, 1231–1232.) In *Sánchez*, our high court noted that a number of out-of-state cases had disapproved certainty instructions based on "scientific studies that conclude there is, at best, a weak correlation between witness certainty and accuracy." (*Sánchez*, at pp. 461–462.) But the *Sánchez* court declined to reexamine the issue, explaining there were a mix of certain and uncertain identifications at trial, and it was "not clear that even those [out-of-state] cases would prohibit telling the jury it may consider this factor" in a case where the defendant "would surely want the jury to consider how *uncertain* some of the identifications were." (*Id.* at p. 462.) Thus, the *Sánchez* court concluded, "Any reexamination of our previous holdings in light of developments in other jurisdictions should await a case involving only certain identifications." (*Ibid.*)

Our Supreme Court granted review in *Lemcke* to reexamine whether instructing a jury to consider an eyewitness's level of certainty when evaluating an identification violates a defendant's

federal and state due process rights. (*Lemcke, supra,* 11 Cal.5th at pp. 653–654.) Unlike in *Sánchez*, in *Lemcke*, there was not a mix of certain and uncertain identifications; rather, the robbery victim's identification testimony, and her confirmation that she had previously identified the defendant in a photographic lineup, constituted the "primary evidence" establishing the defendant's guilt at trial. (*Lemcke,* at p. 646.)

On appeal, the defendant in *Lemcke* argued instructing the jury to consider an eyewitness's level of certainty, without clarifying the limited correlation between certainty and accuracy, violated due process by lowering the prosecution's burden of proof to the extent it caused "jurors to 'equat[e] certainty with accuracy, when science establishes otherwise.' " (*Lemcke, supra,* 11 Cal.5th at p. 657.) Our Supreme Court rejected the argument, concluding CALCRIM No. 315's instruction on witness certainty "does not direct the jury that 'certainty equals accuracy,' " "[n]or does the instruction state that the jury must presume an identification is accurate if the eyewitness has expressed certainty." (*Lemcke*, at p. 657.) Moreover, the court observed, although "the wording of the instruction might cause some jurors to infer that certainty is generally correlative of accuracy," the defendant "was permitted to present expert witness testimony to combat that inference." (*Id.* at pp. 657–658.) And, additional instructions regarding the presumption of innocence and the prosecution's burden to establish guilt beyond a reasonable doubt further undercut the defendant's contention that the certainty language lowered the prosecution's burden of proof. (*Id.* at p. 658.) Thus, "when considered ' "in the context of the instructions as a whole and the trial record," ' " the *Lemcke* court concluded "listing the witness's level of certainty as

17

one of 15 factors the jury should consider when evaluating an eyewitness identification did not render [the defendant's] trial fundamentally unfair or otherwise amount to a due process violation." (*Id.* at p. 661.)

However, while the *Lemcke* court rejected the contention that the certainty instruction in CALCRIM No. 315 violated the defendant's due process rights, our Supreme Court nevertheless agreed with amici curiae that this portion of the instruction "tends to reinforce" the "common misconception . . . that an identification is more likely to be reliable when the witness has expressed certainty." (*Lemcke, supra,* 11 Cal.5th at p. 647.) The court therefore "refer[red] the matter to the Judicial Council of California and its Advisory Committee on Criminal Jury Instructions to evaluate whether or how the instruction might be modified to avoid juror confusion regarding the correlation between certainty and accuracy," and in the meantime, directed trial courts to "omit the certainty factor from CALCRIM No. 315 unless the defendant requests otherwise." (*Id.* at pp. 647–648.)

In light of our Supreme Court's holding in *Lemcke*, we are again compelled to reject Thomas's contention that instructing the jury with the certainty portion of CALCRIM No. 315 violated his due process rights. (See *Lemcke, supra,* 11 Cal.5th at pp. 657–661.) Moreover, even if the trial court had omitted the certainty factor, as *Lemcke* now directs, it is our judgment, based on a review of the entire record, that there is no reasonable probability that Thomas would have achieved a more favorable result at trial. (Cf. *People v. Watson* (1956) 46 Cal.2d 818, 836.)

Unlike in *Lemcke*, here, the eyewitness identification testimony was neither uniformly certain, nor was it the "primary evidence" establishing Thomas's guilt at trial. (*Lemcke, supra,*

18

11 Cal.5th at p. 646.) On the contrary, the record shows the crux of the prosecution's case was Pettaway's identification of Thomas as her passenger, coupled with the security video showing the shooter got out of and returned to the passenger seat of Pettaway's car. While the evidence showed Blair had made equivocal statements about his certainty when he first identified Thomas as the shooter, his testimony that the shooter hopped into the passenger side of the car facing in the opposite direction of the victim's Jeep—i.e., Pettaway's Charger—corroborated the critical video evidence. As for Norman, his identification was indisputably uncertain.

As our high court explained in *Lemcke*, the "misleading effect" that threatens to engender juror confusion about eyewitness certainty—"that the jury is prompted to believe there is a strong correlation between certainty and accuracy despite empirical research showing just the opposite—is *not* present when a witness has expressed *doubt* regarding the identification." (*Lemcke, supra,* 11 Cal.5th at p. 669 & fn. 19, italics added.) Here, there was evidence that both eyewitnesses expressed *uncertainty* about their identification of Thomas, thus obviating the risk that compelled the *Lemcke* court to refer the matter to the Judicial Council. (See *id.* at pp. 647–648, 669 & fn. 19; see also *Sánchez, supra,* 63 Cal.4th at p. 462 [" '[certainty] instruction has merit in so far as it deals with the testimony of a witness who expressed doubt about the accuracy of her identification . . .' "].) Indeed, given this evidence of uncertainty, it is apparent from our review of the record that the primary evidence establishing Thomas's guilt was not the eyewitness identification testimony, but rather Pettaway's identification of Thomas as her passenger and the video footage

showing the shooter got out of and returned to the passenger seat of Pettaway's car. Because the certainty instruction could not have affected the jury's assessment of the credibility of that evidence, it is not reasonably probable that Thomas would have obtained a more favorable outcome had the trial court omitted the certainty factor from CALCRIM No. 315 at his trial.

## 3. *The felony-murder special circumstance allegation is not unconstitutional*

The jury found Thomas committed first degree murder and found true that Thomas killed Sims while engaged in committing robbery. "Once the jury finds the defendant has committed first degree murder, the felony-murder special circumstance applies if the murder was committed during the commission or attempted commission of a statutorily enumerated felony, and subjects the defendant to a sentence of death or of life without the possibility of parole." (*People v. Andreasen* (2013) 214 Cal.App.4th 70, 80.) Robbery is an enumerated felony. (§ 190.2, subd. (a)(17)(A).) Thomas contends that the felony-murder special circumstance is unconstitutional, because it allows a defendant who is the actual killer to be eligible for the death penalty even if the jury does not find the defendant had a culpable mental state.

We quote our Supreme Court: "We have repeatedly held that when the defendant is the actual killer, neither intent to kill nor reckless indifference to life is a constitutionally required element of the felony-murder special circumstance. [Citations.] '[W]e have also rejected the related claim that the imposition of the death penalty under these circumstances fails to adequately narrow the class of death-eligible offenders.' [Citations.] We decline to revisit these precedents here." (*People v. Jackson* (2016) 1 Cal.5th 269, 347.)

### 4. *The LWOP sentence is not cruel and unusual punishment*

Thomas argues his LWOP sentence violates the state and federal constitutions' bans on cruel and unusual punishment because he was just over 18 years old when he killed Sims, and new insights into brain maturation show a person's brain is not fully developed before the age of 25. (Thomas turned 18 in June and killed Sims in November.) Thomas raised this issue in his sentencing memorandum, and the court denied the claim. We agree.

In *Miller v. Alabama* (2012) 567 U.S. 460, the United States Supreme Court acknowledged "children are constitutionally different from adults for purposes of sentencing," as juveniles have diminished capacity and greater prospects for reform than adults: "[T]he distinctive attributes of youth diminish the penological justifications for imposing the harshest sentences on juvenile offenders, even when they commit terrible crimes." (*Id.* at pp. 471–472.) Thus "the Eighth Amendment forbids a sentencing scheme that mandates life in prison without possibility of parole for juvenile offenders." (*Id.* at p. 479.) While the death penalty may not be imposed on a juvenile, a defendant who was 18 at the time of his crime may be sentenced to death: "While drawing the line at 18 is subject to the objections always raised against categorical rules, that is the point where society draws the line for many purposes between childhood and adulthood and the age at which the line for death eligibility ought to rest." (*Roper v. Simmons* (2005) 543 U.S. 551, 553–554; *People v. Gutierrez* (2014) 58 Cal.4th 1354, 1380.)

We are bound by those decisions, and "decline [the] invitation to conclude new insights and societal understandings

about the juvenile brain require us to conclude the bright line of 18 years old in the criminal sentencing context is unconstitutional." (*People v. Perez* (2016) 3 Cal.App.5th 612, 617; *People v. Argeta* (2012) 210 Cal.App.4th 1478, 1482; *People v. Abundio* (2013) 221 Cal.App.4th 1211, 1220–1221.) " 'Making an exception for a defendant who committed a crime just five months past his 18th birthday opens the door for the next defendant who is only six months into adulthood. Such arguments would have no logical end, and so a line must be drawn at some point. We respect the line our society has drawn and which the United States Supreme Court has relied on for sentencing purposes, and conclude [defendant's] sentence is not cruel and/or unusual.' " (*Perez*, at p. 617.) Thomas's LWOP sentence does not violate the Eighth Amendment.

## DISPOSITION

The judgment is affirmed.

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

EGERTON, J.

We concur:

EDMON, P. J.

LAVIN, J.